**Terrence DONOHOE, et al., Plaintiffs,**

v.

**CONSOLIDATED OPERATING & PRODUCTION CORPORATION, et al., Defendants.**

No. 86 C 7543.

United States District Court, N.D. Illinois, E.D.

March 28, 1991.

Herbert Beigel, Norman Rifkind, Beigel & Sandler, Ltd., Bruce Rose, Chicago, Ill., for plaintiffs.

Douglas P. Roller, Rooks, Pitts & Poust, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This Court's lengthy April 10, 1990 memorandum opinion and order (the "Opinion," 736 F.Supp. 845 [1]) disposed of, via summary judgment under Fed.R.Civ.P. ("Rule") 56, virtually all of the numerous claims asserted by 54 investors in one or more oil and gas limited partnerships. All that survived of this action was the claim brought under 15 U.S.C. § 77*l*(2) ("Section 12(2)," referring to the internal section numbering of the Securities Act of 1933, the "1933 Act"). That statute, invoked in Count 4 of plaintiffs' Fourth Amended Complaint, "attaches strict liability to any inclusion of an untrue statement of material fact or any omission of a material fact in a prospectus or oral communication used to offer or sell a security, so long as the plaintiff did not know of the untruth or omission" (Opinion at 876, citation omitted).

Section 12(2) alone remained in plaintiffs' arsenal because that statute does not require a showing of *intent* to defraud on defendants' part (a requirement on which other claims asserted by plaintiffs had foundered) and because material factual disputes remained as to alleged misstatements and omissions represented by the private placement memoranda ("PPMs") for the oil ventures. Now, although plaintiffs and defendants have joined in approving a final pretrial order in preparation for trial, defendants have since moved for summary judgment on the surviving Section 12(2) claim and the parties have briefed that motion. For the reasons stated in this memorandum opinion and order, the motion is granted and this action is dismissed in its entirety.

### *Statutes of Limitations: The Facts* [2]

For the most part no further factual submissions by a movant seeking summary judgment can *eliminate* factual disputes that have been established by the opponent's submissions.[3] Hence defendants' current motion takes the position that even assuming the existence of securities law violations (that is, even assuming that any factual disputes on that score were to be resolved against defendants), plaintiffs have waited too long to assert their claims.

This action was filed on October 3, 1986. To determine whether limitations had run by then on the Section 12(2) claims under the several limited partnerships, it is necessary to set out the facts as to each.

COPCO-1 was offered for sale on April 1, 1983, with PPM-1 calling for a closing date of July 1, 1983. By the latter date only 16.5 of the 30 available units in COPCO-1 had been purchased, subscribed to and accepted. Opinion at 849 & n. 8 explains the circumstances under which COP-

---

**1.** All citations to the Opinion will take the form "Opinion at—," including the page number but omitting the volume number in F.Supp. This opinion will assume total familiarity with the Opinion as a jumping-off place for the discussion here. Hence it will omit the lengthy factual discussion in the Opinion, except as may be essential to make the legal discussion self-contained. This opinion will also employ (without repeating) the same defined terms as are contained in the Opinion.

**2.** Familiar Rule 56 principles impose on the movants the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovants—in this case plaintiffs (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)). As with the earlier Rule 56

motion (see Opinion at 846 n. 2), the parties have complied with this District Court's General Rule ("GR") 12(m) and 12(n), which are simply a relettering of the provisions referred to in the earlier Opinion as GR 12(*l*) and 12(m). Accordingly the parties' submissions here will be referred to respectively as "D. 12(m) ¶ —" and "P. 12(n) ¶ —."

**3.** There are limited exceptions to that statement of what is pretty much a truism. If for example the current affidavit of a Rule 56 opponent purports to identify a controverted issue of material fact, and if the movant for summary judgment then points to earlier sworn testimony by the affiant to the contrary, the cases do allow the affidavit to be rejected and summary judgment to be granted based on the admissions in that earlier testimony (see, e.g., *Richardson v. Bonds*, 860 F.2d 1427, 1433 (7th Cir.1988) and cases cited there; *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986)).

CO itself purchased the remaining units after July 1, 1983 (at a time when drilling had already begun and the first well had been completed), with the units then being offered for sale to limited partners until mid-September 1983. By September 17, 1983 at the latest all the plaintiffs who participated in COPCO–1 had entered into and funded their commitments to invest in that project, and those commitments had been accepted.

Plaintiffs quarrel with that sequence of events, contending that as a technical matter the terms of the limited partnership agreement (and therefore of the securities offering itself) were not complied with. Their arguments are really bogus, given plaintiffs' total silence on that subject for more than seven years. Everyone (including plaintiffs) treated the purchases as having been consummated back then in 1983, and the money of plaintiffs and other investors was then used in the oil venture without any contention that COPCO–1 had no right to do so.[4] Even on the facts most favorable to plaintiffs in reasonably arguable terms, the latest date for the completion of all the sales was in mid-September 1983.

As for COPCO–2, COPCO–3 and COPCO–4, plaintiffs admit the factual assertions set out in D. 12(m) ¶¶ 6–9. That absence of any factual quarrel in those areas confirms that all the units in those three drilling program limited partnerships had been purchased before the end of 1984.

So much, then, for the times at which the statute-of-limitation clocks potentially began to tick on the several securities transactions. What remains is to set out the

facts as to the date of plaintiffs' realization—or perhaps their imputed realization—of the material misrepresentations or omissions that they have now ascribed to the PPMs.

D. 12(m) ¶¶ 10–53, set out in Appendix 1 to this opinion (which is the entire D. 12(m) without accompanying exhibits), accurately set out (with one minor exception) the extent of early knowledge and concerns on the part of the most knowledgeable investors: first-named plaintiff Terrence Donohoe ("Donohoe") and Jack Elder ("Elder"), Clarence Sopko and Bernard Medvill.[5] When the underbrush is cut away from the P. 12(n) response, it is plain that plaintiffs do not really contest the material factual assertions by defendants, instead making an argument that plaintiffs themselves frame in these terms (P. 12(n) at 2–3 (emphasis in original)):

> As the Court noted in its Memorandum Opinion and Order, this case is now markedly different than when first filed. The remaining claim under § 12(2) attaches *strict liability* to any inclusion of a misrepresentation of a material fact in or any omission of a material fact from a prospectus. Much of the discovery taken by the parties—which addressed defendants' fraudulent scheme and mismanagement of the partnership—is no longer relevant to plaintiffs' § 12(2) claims. Unfortunately, much of this evidence— evidence that relates to defendants' mismanagement of the partnership—has been cited by defendants in support of their argument that plaintiffs' § 12(2) claims are time-barred.

---

**4.** No wonder, then, that plaintiffs' current argument is wholly unpersuasive. Their position now is based on the subscription agreement's provision that if the purchasers' offers were not accepted by July 1, 1983, all the collected funds had to be returned to the investors. But when plaintiffs themselves permitted the transaction to proceed without cavil despite the known failure of COPCO–1 to meet that timetable, they cannot jump up years later to complain that the accepted subscriptions were somehow *void* from the very beginning. Whether on grounds of waiver, laches or otherwise, their argument is empty and is rejected.

**5.** D. 12(m) ¶ 39 does not accurately reflect the testimony of Donohoe to which it refers (Donohoe Dep. 190). But that is really irrelevant, for it mistakenly attributes to Donohoe's lawyer rather than to Donohoe himself the view in May 1985 that his "investment was in trouble." Nothing hangs on that difference, and as the later discussion reflects there is no doubt that by July 1985 at the latest Donohoe and his fellow investors (based on their own statements) had the kind of knowledge that directly triggered the running of limitations on their Section 12(2) claim.

This Court's Opinion dismissed some of the misrepresentations and omissions plaintiffs attributed to defendants. The misrepresentations of material fact in, and material omissions from the prospectuses that remain subsequent to this Court's Opinion—and will not be repeated here—are the *only* issues to be resolved. Defendants' claim that Plaintiff Donohoe knew about defendants' mismanagement of the partnership in late 1984 and early 1985 may be relevant as to when the statute of limitations began as to plaintiffs' fiduciary duty claims—but has no relevance as to plaintiffs' § 12(2) securities claims. When read in that context, defendants' statement falls far short of establishing that Donohoe or the other plaintiffs discovered the untrue statements in or omissions from the prospectuses or should have discovered them by the exercise of reasonable diligence before October 3, 1985, one year before they filed their complaint.

What plaintiffs argue again and again in their individual responses to defendants' 12(m) statements is that the knowledge and concerns evidenced and articulated by Donohoe and other plaintiffs amounted only to knowledge or to inquiry-notice of *post*-sale mismanagement, and not of *pre*-sale misrepresentations or omissions. As the later discussion of legal principles in this opinion reflects, that is simply wrong. But again what is important for current purposes is that the relevant *facts* asserted by defendants are not really controverted.

Included among the material facts in this respect are these:

1. Donohoe's statement at a November 1984 meeting with Interbanc employee Curtiss Bergquist ("Bergquist") that "It seems to me that the people that have collected all this money had other intentions than drilling these wells" (Donohoe Dep. 134 [6]);

2. Donohoe's January 1985 statement to Bergquist and Stan Cole that "I believed the whole program was a fraud and that it was a stall tactic" (*id.* at 82);

3. Elder's statements to Donohoe after their April 1985 inspection of the COPCO fields that "We're screwed," "We've been had" and "This thing is a sham. I can't believe I was so stupid to invest in it" (*id.* at 274); and

4. most conclusive and damning, the entire transcript of the July 24, 1985 meeting of plaintiffs' Concerned Investors Committee, which had previously been formed by Donohoe and which was convened for an airing of the investors' investigations and serious concerns (D. 12(m) Ex. N, reproduced as Appendix 2 to this opinion).

Although that does not represent an exhaustive listing of all the evidence that demonstrates without contradiction the matters that were then known or believed by more than one of the plaintiffs (and that are ascribable to all the plaintiffs in "reasonable diligence" terms), those listed items suffice to enable this opinion to turn to the controlling law on the subject.

### Statute of Limitations: The Law

Two separate limitations periods apply to Section 12(2) claims. One is the drop-dead provision of Section 13, 15 U.S.C. § 77m:

In no event shall any such action be brought to enforce a liability created ... under section 77*l*(2) [Section 12(2)] of this title more than three years after the sale.

On that score *Norris v. Wirtz*, 818 F.2d 1329, 1332 (7th Cir.1987) confirms the unequivocal bar created by that portion of Section 13 ("It was understood that the three-year rule was to be absolute"). But Section 13 also includes a discovery provision that kicks in earlier (emphasis added):

No action shall be maintained to enforce any liability created under section 77k or 77*l*(2) [Section 12(2)] of this title unless brought within one year after the discovery of the untrue statement or the omission, *or after such discovery should*

---

[6]. All the relevant pages from Donohoe's deposition are reproduced in D. 12(m) Ex. I. Further citations will set out only the pages in the deposition transcript, without any needless repetition of the exhibit number.

*have been made by the exercise of reasonable diligence ....*

Again *Norris*, 818 F.2d at 1334 (citations omitted) (more recently reconfirmed in *Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp.*, 910 F.2d 1540, 1544 (7th Cir.1990)) provides added intelligence, this time as to the application of the discovery principle:

> The rule of law applicable to this case therefore is, as the district court concluded, that the time to file suit begins to run when the investor either knows or in the exercise of reasonable diligence could have discovered the facts on which the suit is based. The investor need not actually know the facts or appreciate their significance; the "could have discovered" branch of the test is objective. And whether the investor actually exercised diligence also is irrelevant. The question is not whether she did, but whether diligence would have paid off. Failure to be diligent is no excuse, as [*Teamsters Local 282 Pension Trust Fund v.*] *Angelos* [, 815 F.2d 452 (7th Cir.1987)] holds.

Only the investments in COPCO–1 (and not those in the later oil ventures) are potentially subject to the three-year absolute bar of Section 13. For the reasons already set out in this opinion's factual discussion, the filing of this action on October 3, 1986—more than three years after the September 15, 1983 outside date for the sales of the COPCO–1 interests—was time-barred as to those investments alone.

But even were that not the case, all the COPCO–1 as well as the COPCO–2, COPCO–3 and COPCO–4 investors unquestionably waited too long to file this lawsuit. When it comes to what the investors *could* have discovered "by the exercise of reasonable diligence":

1. *All* the plaintiffs may fairly be charged with the knowledge or potential knowledge that is directly ascribable to Donohoe—they can scarcely challenge the notion that Donohoe's actual investigative efforts represented the exercise of "reasonable diligence."

2. *All* the plaintiffs may also fairly be charged with the knowledge of other fellow investors. And when any individual plaintiff reasonably expressed himself or herself, based on such knowledge, in terms that confirmed that plaintiff's belief in defendants' misconduct such as to demand further inquiry or investigation, *all* the plaintiffs must be held to that same duty to exercise "reasonable diligence."

3. Not later than the time of the July 1985 meeting of the Concerned Investors Committee, *all* the plaintiffs had available to them the kind of information that unquestionably mandated such further investigation. It is necessary only to read the transcript of that meeting (Appendix 2 to this opinion) to see that.

4. It is simply wrong for plaintiffs to mischaracterize, as they persistently seek to do, the statements and beliefs of Donohoe (and of some other plaintiffs)—by labeling what Donohoe and those other plaintiffs perceived as defendants' "fraud" and "sham" and "con" activities and wrongdoing, among other pejorative labels—as though such labels were somehow limited to *post*-sale mismanagement rather than also bearing upon *pre*-sale misrepresentations and omissions. If the legal test were limited to actual knowledge rather than extending to what could have been learned through reasonably diligent investigation, such an argument might—just might—be tenable. But people armed with Donohoe's and others' knowledge and concerns had to be hopeless myopes, or to don impermissibly narrow-focused blinders,[7] not to pursue active inquiry into the subject of defendants' misconduct in connection with the sale of securities that ultimately generat-

---

7. Cf. this Court's opinions in *Teamsters v. Angelos*, 624 F.Supp. 959, 964–65 (N.D.Ill.1985), *aff'd on related grounds*, 815 F.2d 452, 456–57 (7th Cir.1987) (cited with approval in the earlier quotation from *Astor Chauffeured Limousine*) and

ed the complaint in this action.[8]

What the evidence compels instead is the conclusion that one or more plaintiffs certainly knew enough to start the Section 12(2) clock ticking by the time of the July 1985 meeting if not sooner.[9] Instead of bringing suit within the statutory one-year period thereafter, they chose a different course of action: They tried to salvage the drilling ventures through their own efforts during that year. They were of course free to do that, just as any other injured party may choose to let the statute of limitations lapse without pursuing his, her or its claim. But having done so—and there being no evidence or contention that they were lulled into such delay by defendants' conduct [10]—they must suffer the consequences of their own fatal delay.

It follows that all the investors' claims under Section 12(2)—whether stemming from their investments in COPCO–1, COPCO–2, COPCO–3 or COPCO–4—are barred by the one-year discovery provision of Section 13. It is therefore unnecessary to address the open factual issues that were identified in the Opinion, which have been rendered non-material (that is, non-outcome-determinative) by the untimeliness of this lawsuit.

### Conclusion

Before today's ruling, only one arrow shaft remained in plaintiffs' litigation quiv-

er—their Count 4 claim under Section 12(2). But on analysis it turns out that there are no genuine issues of *material* fact on that claim either, so that defendants are entitled to a judgment as a matter of law on that claim as well—the expiration of the statute of limitations has caused the remaining potential arrow to have no point (in the legal sense). Accordingly Count 4 and this action itself are dismissed with prejudice.

### APPENDIX I

### DEFENDANTS' STATEMENT OF MATERIAL FACTS

NOW COME defendants Consolidated Operating and Production Corporation ("COPCO"), Jack Nortman ("NORTMAN") and Morando Berrettini ("BERRETTINI"), by and through their attorneys Douglas P. Roller and Rooks, Pitts and Poust and pursuant to Rule 12(1), Local Rules for the Northern District of Illinois, present their statement of material facts as to which there is no genuine issue.

1. Each of the plaintiffs are among investors who purchased units or portions of units in one or more limited partnerships described by plaintiffs as COPCO Drilling Program 1983–1 ("COPCO 1"), COPCO Developmental Drilling Program 1983–2 ("COPCO 2") COPCO Developmental Drill-

---

in *McCarthy v. PaineWebber, Inc.,* 618 F.Supp. 933, 937 (N.D.Ill.1985).

**8.** Indeed, plaintiffs could scarcely prevail here even in terms of their own attempted artificial distinction. Even if what they knew and suspected by not later than July 1985 had involved proof (or suspicion) of only *post*-sale mismanagement and downright fraud, they clearly perceived that impropriety as so fundamental and pervasive—and it tied in so closely with the representations made in the PPMs—that *any* reasonable investor would have known that the entire subject of how crooked the promoters had been had to be investigated further (and swiftly). And that of course is precisely the "reasonable diligence" that is demanded by Section 13, so that the statutory one-year discovery time clock ran out (at the latest) over two months before plaintiffs chose to go to law by bringing this lawsuit.

**9.** Donohoe and his co-plaintiffs would obviously prefer to forget that among the things he spoke

of at the July 25 meeting, over and above what he characterized as "more than just mismanagement" (App. 2 at 342), was that "We know about ... SEC violations" (*id.* at 338). Although Donohoe had earlier eschewed the term "fraud" out of a desire for caution (*id.* at 329–30), in terms of inquiry-notice (at a minimum) the meeting transcript leaves no room for doubt.

**10.** No waiver or estoppel argument is made (or possible) under the facts here. Quite to the contrary, several of the investors spoke specifically of the availability of a lawsuit at the July 25 meeting and *deliberately* chose not to take that action (App. 2 at 345, 346, 348–49). And the final nail is driven into plaintiffs' coffin by the fact that their later decision to *take* legal action was reached in June 1986 (D. 12(m) Ex. X) based on the conclusion that the sales had been fraudulent—thus *within* one year after the July 1985 meeting—and yet suit was not filed until October 1986, after the anniversary date of that meeting had passed.

ing Program 1983–3 ("COPCO 3"), and COPCO Developmental Drilling Program 1984 ("COPCO 4") [Complaint, para. 4 and Exhibit A attached thereto].

2. Each of the programs were offered through a Private Placement Memorandum (hereinafter PPM–1, PPM–2, PPM–3, PPM–4 respectively).

3. COPCO 1 was offered for sale on April 1, 1983 (PPM–1, p. 2, attached hereto as Exhibit A).*

4. The closing date for sale of COPCO–1 was July 1, 1983 (Exhibit A).

5. As of July 1, 1983, 16.5 units in COPCO 1 had been purchased, subscribed to and accepted. Subsequent to July 1, 1983, COPCO purchased the remaining 13.5 units but offered these units for sale to limited partners until September 17, 1983. 3.5 units were purchased by limited partners prior to September 17, 1983. (Berrettini Deposition pp. 207–210, [portions of Mr. Berrettini's deposition are attached hereto as Exhibit B]; COPCO correspondence dated August 10, 1983, attached hereto as Exhibit C).

6. COPCO 2 was issued on October 25, 1983 and closed no later than March 1, 1984 (PPM–2, p. 2, attached hereto as Exhibit D).

7. COPCO 3 was issued on November 17, 1983 and closed no later than March 31, 1984 (PPM–3, p. 2, attached hereto as Exhibit E).

8. COPCO 4 was issued on March 15, 1984. (PPM–4, p. 2, attached hereto as Exhibit F).

9. The minimum number of units for COPCO 4 were not sold until approximately December 31, 1984. (COPCO correspondence dated December 31, 1984 attached hereto as Exhibit G).

10. Plaintiffs Terrence Donohoe, Jack Elder, Clarence Sopko and Bernard Medville are the plaintiffs with the greatest knowledge of the facts of the case (Plaintiffs' Answers to Supplemental Interrogatory No. 5 attached hereto as Exhibit H).

11. Plaintiff Terrence Donohoe first became concerned about his investment in COPCO 3 at a July 1984 investors meeting (Deposition of Terrence Donohoe, 2/11/88, portions of which are attached hereto as Exhibit I, p. 131).

12. In November, 1984, Donohoe met with plaintiff Curtis Bergquist ("Bergquist") who also was an official of Interbanc, the seller of the securities. During that meeting, Donohoe told Berquist that Donohoe did not believe the COPCO officials were "shooting straight" with the investors and that he suspected mismanagement of funds. Bergquist said that he had heard allegations of commingling of funds by the general partners. Also during the meeting, Mr. Donohoe stated, "it seems to me that the people that have collected all this money had other intentions than drilling the wells." (Exhibit I, pp. 131–136).

13. Also during the November 1984 meeting with Bergquist, a discussion was had regarding the investment as a whole, whether it was a gas field or an oil field, and a disagreement regarding the definition of "turnkey" (Exhibit I, pp. 136–138).

14. Donohoe's meeting with Bergquist in November, 1984 served as the "catalyst" for Donohoe's trip to Texas in December 1984. (Exhibit I, pp. 138–140).

15. In December, 1984, Donohoe made his first trip to Texas. He made this trip because he did not believe what he was being told about the status of his investment or the fields. (Exhibit I, pp. 48–49).

16. During the trip to the COPCO fields in December, 1984, Donohoe observed that flow lines that were supposed to have been delivered previously were just being delivered and that a generator that was supposed to have been there was not on the field. Mr. D'abre told Donohoe that funds had not been received from COPCO in Chicago. (Exhibit I, pp. 61–70).

17. Donohoe called Bergquist from Texas in December 8, 1984 to express his displeasure with what he had observed in the fields. Bergquist told Donohoe that he

* Editor's Note: The exhibits are not included in this Appendix. See p. 317 supra.

(Bergquist) had been lied to by COPCO people. (Exhibit I, pp. 72–73).

18. On December 8, 1984, Donohoe also called his personal lawyer to advise him of Donohoe's conclusion that he had been "duped". (Exhibit I, pp. 72–73).

19. On December 17, 1984 Donohoe met with Dennis Bridges. During the eight hour conversation, Mr. Bridges stated: Donohoe should be patient and not go to the Attorney General or pursue legal action; Donohoe was correct in his conclusions about the flow lines and generator; the lack of funding was because of Nortman and Berrettini; the prospectus prohibited transfer or resale of units but that Nortman had sold units to his father; he suspected that money had been "played with" out of the general funds of COPCO, and; the prospectus provided that profit from ONA would go back to the partners in COPCO. (Exhibit I, pp. 91–109).

20. In January 1985, Donohoe told Bergquist that Bergquist had "better do something" because Donohoe was "running out of patience." (Exhibit I, p. 123).

21. After receiving copies of correspondence from COPCO and Interbanc at the end of January, 1985, stating that COPCO Programs 1, 2 and 3 were completed, Donohoe had a meeting with Cole (also an official of Interbanc) and Bergquist. At that meeting Donohoe stated that he didn't believe the contents of the letters and expressed his belief that the whole program was a "fraud." (Exhibit I, pp. 76–86).

22. On March 18 and 19, 1985, Donohoe met with a Mr. Gibe in New Orleans and a Mr. McIntyre in the vicinity of Houston, Texas. Donohoe made the trip to learn about the oil and gas business. Mr. Gibe had been put in touch with Mr. Bridges by Donohoe in the fall of 1984 as a means to find out more about the COPCO Programs. Mr. Gibe told Mr. Donohoe that the COPCO offerings and geological survey were "sloppy" and that certain well numbers had been changed to conform with test results. (Exhibit I, pp. 159–169).

23. During Donohoe's meeting with Mr. McIntyre, who had been in the oil and gas business for over forty years, Mr. Donohoe discussed some of his concerns about the COPCO program with Mr. McIntyre, including the cost of the turnkey, commercial wells, AFE's, and division orders. Mr. Donohoe also engaged in "heavy geological and geopetro" conversation with Mr. McIntyre. (Exhibit I, pp. 207–217).

24. Mr. McIntyre told Donohoe that he thought "something was amiss in the partnership or in that investment." (Exhibit I, p. 219).

25. As a result of the meeting with Mr. McIntyre, Donohoe became even more concerned about COPCO. (Exhibit I, pp. 217–218).

26. Also as a result of the meeting with Mr. McIntyre, Donohoe located fellow investors, reread the prospectus, and caused an audit of COPCO to be undertaken. (Exhibit I, p. 217).

27. Following the meeting with Mr. McIntyre, Donohoe also started to buy books regarding oil and gas exploration to better understand the business. (Exhibit I, p. 223).

28. In March or April, 1985, Donohoe, through his lawyer, Lewis G. Greenblatt, made a request pursuant to the prospectus to view the books and records of COPCO. (Exhibit I, p. 180).

29. On approximately April 5, 1985, Donohoe met with investor Sandra Raven and coplaintiffs Jack Elder, John Schwartz, Bernard Medville and Clarence Drucker. Donohoe contacted these individuals at random after obtaining a list of investors from the State of Illinois. During the meeting, Donohoe told the other investors that he believed they "had a very large problem." Donohoe related what he had observed on his trip to Texas in December, 1984 as well as his meeting in January, 1985 with Mr. Nortman regarding the books and records of COPCO. (Exhibit I, pp. 225–227; 232–234).

30. At the April 5, 1985 meeting, Donohoe related the following specific concerns: the program had gone beyond its projected

date of performance; communication was partial and almost non-existent and the explanations were not convincing, and; nothing had happened between July, 1984 and April of 1985. (Exhibit I, pp. 234–235).

31. Also at the April 5, 1985 meeting, Donohoe questioned whether the defendants and ONA could be trusted. The outcome of the meeting was that Donohoe and Elder were to take a trip to the COPCO fields. (Exhibit I, pp. 236–240).

32. Sometime prior to April 15, 1985, Donohoe had a meeting with a second group of investors. Present at this second meeting were plaintiffs Clarence Sopko, William Hajduk, Arnie Jensen, Frank Hays, George Kanpka, Joe LaPota, William Masseth and Allen Nathan. Donohoe expressed the same concerns at this meeting which he had expressed at the April 5, 1985 meeting. (Exhibit I, pp. 226, 240–244).

33. During approximately the same time period as the investors meetings, Donohoe contacted attorney Lewis Greenblatt concerning his legal rights. (Exhibit I, pp. 243–244).

34. During the April, 1985 trip to Texas, Donohoe and Elder inspected the COPCO fields and took photographs in order to document what Donohoe described as "incongruities" or what he thought was "highly irregular." They also took photographs of various wells and turned on valves of what were pointed out to them to be gas well caps. According to Donohoe, no gas came out of any of these wells. Donohoe described the field as not completed and not producing. Donohoe and Elder also took down registration numbers of several pumps, tanks and generators. (Exhibit I, pp. 248–258; 271–272, 279–283, 291, 299).

35. Immediately following their inspection of the COPCO fields in April, 1985, Mr. Elder told Donohoe that "we're screwed;" "we've been had", and "this thing is a sham. I can't believe I was so stupid to invest in it." (Exhibit I, p. 274).

36. Donohoe and Elder reached a consensus following this trip that they would pursue a request for an audit of COPCO's

books and consult an attorney for legal counsel. (Exhibit I, pp. 275–276).

37. After returning from Texas, Donohoe met with attorney Greenblatt. This meeting occurred sometime between April 15 and April 26, 1985. Mr. Elder was present at either this meeting or subsequent meetings with attorney Greenblatt. (Exhibit I, pp. 278–279, 303).

38. In May of 1985, accountants on behalf of Donohoe reviewed certain books and records of COPCO and issued a report. Donohoe also reviewed certain financial records of COPCO. (Exhibit I, pp. 180–184, 188–189).

39. Following the audit, Donohoe consulted with his attorney who told him his "investment was in trouble". (Exhibit I, p. 190).

40. Mr. Elder, Mr. Hayes, and Mr. Schultz were among the investors requesting the audit. (Exhibit I, p. 191).

41. The audit in May 1985 gave Donohoe "greater concern" over the management of COPCO. (Exhibit I, P. 195).

42. Donohoe drew the conclusion at the time of the audit that his investment was "in serious, serious disarray and trouble" and that there was "a shred of truth" to the allegations made by D'Abre and Bridges. (Exhibit I, pp. 200–201).

43. In June 1985, Donohoe and Elder invited other investors to a meeting in Des Plaines, Illinois. At that meeting, only the investors whom they could contact and were interested in discussing their investment attended. (Exhibit I, pp. 303–304).

44. Somewhere between April of 1985 and July of 1985, the Concerned Investors Committee was formed. (Deposition of Terrence Donohoe, dated 12/1/88, portions of which are attached hereto as Exhibit J, p. 8). Upon the formation of the Committee a bank account was opened on behalf of the concerned Investors Committee. This bank account was opened on May 24, 1985. (Exhibit J, p. 46; Certified Resolution of Unincorporated Organization dated May 24, 1985, attached hereto as Exhibit K).

45. The Concerned Investors Committee and specifically Donohoe and plaintiff Jack

Elder called a meeting of all Investors in the COPCO Programs for July 25, 1985. A notice of this meeting was sent to all investors in the COPCO Programs. (Exhibit J, pp. 19–21; a copy of the notice of the July 25, 1985 investors meeting is attached hereto as Exhibit L).

46. Approximately 19 investors signed a sign in sheet acknowledging attendance at the July 25, 1985 COPCO investor's meeting. (Exhibit J, p. 22; a copy of this sign in sheet and a hand out at the meeting are attached hereto as Exhibit M).

47. Donohoe read the Prospectus for COPCO 3 approximately six times. Notes of his review of the Prospectus were attached to the sign in sheet produced by Donohoe during discovery. (Exhibit I, p. 97; Exhibit J, pp. 22–24; Exhibit M).

48. A tape recording was made of the investor's meeting on July 25, 1985. The first seven pages of that transcript constitute an accurate recordation of the comments made at that meeting. The remainder of the transcript likewise appears accurate to Mr. Donohoe. (Exhibit J, pp. 8, 14–20; 24–26; a copy of the transcript of the transcript of the July 25, 1985 meeting is attached hereto as Exhibit N).

49. A second Investors Committee meeting was held on August 28, 1985. The notice regarding this meeting was sent to all Limited Partners. (The notice for the August 28, 1985 meeting is attached hereto as Exhibit O; Exhibit J, pp. 27–30).

50. At the August 28, 1985 meeting, it was decided that the Concerned Investors Committee would oversee the COPCO programs on behalf of all investors (Exhibit J, pp. 109–111).

51. By September 25, 1985, twenty investors had contributed to the Concerned Investors Committee. Eventually, forty-six investors contributed to the Committee. (A copy of the membership list, with names of investors, dates contributions were made and amounts of contributions, kept by plaintiff Donohoe is attached hereto as Exhibit P; Exhibit J, pp. 50–51).

52. Prior to the August 28, 1985 investor's meeting, Bridges, with the assistance of Curtis Bergquist, had directed the COPCO 4 15% call to Bridges (correspondence dated July 20, 1985 from Dennis Bridges, attached hereto as Exhibit Q; correspondence from Gregory Sweeney dated July 25, 1985, attached hereto as Exhibit R; August 2, 1985 correspondence from Curtis Bergquist, dated August 2, 1985, attached hereto as Exhibit S).

53. Curtis Bergquist began dealing directly with Don Owens of Tech Lines, Inc. concerning construction of a pipeline and possibly becoming operator of the field (correspondence dated August 26, 1985 from Curtis Bergquist attached hereto as Exhibit T).

54. On approximately March 11, 1986, Robert Stovall met with Curtis Bergquist, Clarence Sopko, Arnie Jensen and others regarding the COPCO fields (correspondence from Mr. Nortman dated March 4, 1986, attached hereto as Exhibit U).

55. Robert Stovall communicated directly with plaintiffs Bernard Medville and Clarence Sopko regarding his work on the COPCO fields (correspondence dated April 29, 1986 from Robert Stovall, attached hereto as Exhibit V).

56. On May 12, 1986, Robert Stovall advised that it would cost $100,000 to $110,000 to make the wells in COPCO 1, 2 and 3 ready for gas production. (Correspondence dated May 12, 1986 from Robert Stovall, attached hereto as Exhibit W).

57. Between August, 1985 and June, 1986, members of the Concerned Investors Committee acted on behalf of the other investors in determining the status of the COPCO investments. (Exhibit J, pp. 31–35; Exhibit X).

58. On June 17, 1986, an investor's meeting was held. The purpose of the meeting was to discuss finalizing legal action to be taken. (Notice of June 17, 1986 meeting, attached hereto as Exhibit X).

59. At the June 17, 1986 meeting, a handout reflecting the results of the investigation conducted by Mr. Donohoe was provided. (Exhibit J, pp. 109–111; a copy

of the handout at the June 17, 1986 meeting regarding results of investigation, attached hereto as Exhibit Y).

Respectfully submitted,

ROOKS, PITTS AND POUST

By: <u>Douglas P. Roller</u>
One of the Attorneys for Defendants,
Consolidated Operating & Production

Corporation, Jack Nortman and Morando Berrettini

Douglas P. Roller

Rooks, Pitts and Poust

55 West Monroe Street

Suite 1500

Chicago, Illinois 60603

312/372-5600

## APPENDIX II

COPCO INVESTORS COMMITTEE GATHERING Date: 7/24/85
Sheraton NorthShore Inn Start Time: Approximately 7:30pm
933 Skokie Blvd., Northbrook, IL.

"I want to thank you for coming out tonight. My name is Terry Donohoe and on behalf of your fellow investors I welcome you to the Concerned Investors of the Copco Operating & Production Committee: Mr. Frank Hayes, Mr. & Mrs. Al & Valerie Nathan, Mr. & Mrs. George & Delores Kampka, Mr. Bill Masseth, Mr. Jack Elder, Mr. John Schultz, Mr. Ed Johnson and myself, Mr. Donohoe.

You are here primarily in response to our communication to you stating our concern over our investments. So, what I planned for tonight, with Mr. Elder's help, is a synopsis of what type of actions we took together as a group that led to this particular meeting, what we found out to date of our own accord is the status of our investment, and discussion of our mutual concerns and a possible solution of the problems ... if, indeed, they are problems.

I'm going to start with the following and I beg your indulgence. So we have a focal point, I'm going to give a brief history of why and how this all started. And, I'll have to interject a personal note. Will you please make yourselves as comfortable as possible. I'll probable be without the tie and coat in about ten minutes; but, I thought we'd go through the formality of it.

I bought this investment in December of '83 and believed, despite the claims of the salespeople, that like all good intentions—being in the steel business that I own—even the best intentions don't work out and they go astray at times, and the economy being what it is I put myself in the position of allowing not just despite the claims of the 'turn-on investment' of three months down the line, I doubled the time and I multiplied it by two. In other words, I figured I could afford personally because I do my own financing in my business, I could afford to hold this investment without any return for about a year's time, or four payments to the bank where I went and secured financing for this one unit of Copco # 3.

So, the first quarter went by ... I didn't hear much. The second quarter went by and it's about mid-year of '83. About a year ago, and this starts the history for me, I started to just say get antsy on general principle. And, so, like some of you or many of you, I came to the meeting that Copco Investors had last year, a little more than a year ago, I think it July 12 or thereabouts, and at that meeting I heard many different things. I heard reports from the partners, i.e. the General Partners, and I also heard a particular report that stated from the Field Engineer and Geologist, whatever Mr. Daubry's title is, that they had five work days left at which time plug it in, turn on the pumps and off we go! Now I, probably like yourselves, thought five days isn't a lot of work to do so I can hold out. I could be a little more patient. Well, and I want to make the point clear here, is that the term 'possible gassification' was thrown out in particular Phase # 1 and perhaps that there might be a unitization of the Phases # 1, # 2 and # 3. For those that don't understand that what it came down to was there was gas in Phase # 1, some gas & oil in Phase # 2, and basically oil in Phase # 3. That's what I believe I heard. But, I did hear, because I wrote it down, that there was five days left to complete this project and they would turn it on and produce.

August of '84 I contacted COPCO & Interbank with a view towards doing some possible steel business although I'd never been in that end of the business; but, also as a view

maybe of birddogging and getting an inside view as to the cost of the items despite the fact it's a 'Turnkey Operation', I wanted to know how much we were being, what the kind of markups were on steel casing that goes in the ground, etc. I, at that time, contacted a friend of mine from the steel business that made the jump from steel sheets and that type of material in the steel articles into the casing business and in fact was selling casing from New Orleans for two or three years to people like Texaco and people of that nature. And, so I ascertained some direction, some explanation of casing, oil field equipment costs, mark-ups, methods of payment, drilling costs and I asked him to snoop around and see if he could find out anything about COPCO just in general, or any of the people.

September '84—Still in contact with COPCO & Interbank asking about the status of the field, progress reports, and was told things like generator was on the way, can't turn on the field unless we have some power. Flow lines were in the ground, we're going to start pumping anyday, except we have some bad weather delays. Have patience all is in control. That's September.

October—My suspicion rouse. I've been in construction before I got in the steel business. As a matter of fact, I worked 8 years as a foreman out in the field and I know what bad weather is. I think I do at least, but it's still kind of bugging me. It's October. It's July. It's still those five days. No switch turned on ... no nothin'. So, I got a little more acquainted with the ONA Drilling people: Generator couldn't be delivered due to weather and I'm reading off notes that I scribbled along the way, so bear with me, and I started to talk to my lawyer. I said it doesn't seem to be progressing the way I imagined it. By the way, I'd made my third payment by this time. I contacted my friend in New Orleans as I say, who was discussing and learning about the steel end of the business.

Got to November. Was pretty well convinced that something was way off center. I contacted the Attorney General of Illinois. I got my rights as an investor explained to me at length according to the Illinois Limited Partnership Act. I tried to do some reading. The weather in Texas was still bad so nothing had changed there. I had a meeting with Mr. Berquist of Interbank and succinctly put I threatened in a nice way to seek counsel ... which in effect would unplug everything and it all stops cold. In effect, if I didn't get a little support—meaning from their organization—doing some investigation in pushing these people in Texas to a completion, weather or no weather. This was done and agreed to. They did take an active part at that time by, I think, they started many of the treks down there. But, again I discussed more of the problem with my personal attorney and got some more ideas.

Now, I want to interject this point and I think it's very, very important that you understand this. I truly believe that I had a moral and ethical commitment to my fellow investors of whom I knew none of you—not one of you other than by chance of friendship—not to unplug, not to go running, not to scream wolf. So, I didn't! I put that off as of December of '84. Instead I decided I'd go down for myself to take a look around and I did.

Prior to this I was told the generator was around the corner and, God, it's like at the bottom of the road. Just had to slide it up there. And the flow line, into which the oil flows through when you pump, that had already been delivered and was in the ground. Despite the directions I was given, it took me quite a while to find our investment field. I got there about two o'clock on a Friday afternoon on the 14th of December and I could see that the flow line was just coming off a truck. As a matter of fact, I didn't even know what it was until I asked. It was being laid on top of the ground. This is the same flow line that supposedly was going to be in in five days of work. This was in December. I confronted Mr. Daubry in a very hostile way, admittedly, and I wanted to know some answers to some questions. He told me that in six months there had been no funding from COPCO. He told me about the bounced payroll checks to his men in the field, told me that no work had been done since his visit up here when he stood in front of us in July when he said there was five days to go. In effect, nothing had been done.

I saw a truck that we own, meaning the partnership, totally cannibalized, destroyed. I mean down on its' axels ... nothing left to it. I asked him in his opinion what did this translate into because I'm familiar somewhat with construction. What does it mean in terms of labor costs? His estimate was 100% more labor costs. I asked him what it meant in terms of equipment costs? His estimate was 20% to 30% more equipment costs.

I had planned to stay the weekend and visit with a friend. As a matter of fact, I was staying with a friend to defer costs and I was so angry that I raced to the phone. It's Friday afternoon now. I called Mr. Cole. He had left for the day. I called Mr. Berquist. He had left for the day. I got a hold of Mr. Bridges down in Houston. Mr. Bridges suggested I fly out the next morning from Dallas, take the hop down to Houston, and that he would come clean and tell me the story so I did. As I said, the results of the inspection showed that none of the claims of work accomplished that I had been told before I arrived had even been done.

So, I show up in Houston at 9 o'clock on Saturday morning. Called Mr. Berquist from the airport and gave him an earful. Called my lawyer and gave him an earful. I met Mr. Bridges coming off the plane and for eight hours NONSTOP we sat in that airport. I can't tell you what's outside the door of that airport because I never got outside the door of that airport. Eight hours I heard this tale of woe. I heard about the inner fight. I heard about the personalities. I heard about the cut-off funding. I heard admissions that 'yes, there were indeed problems'. But, I heard a plea to be patient. He would bring-in the field. He would complete it.

I've been in tough situations in business. I'd waited a year. I could wait a little bit longer. I returned to the field on Monday and heard, in fact, that some of the claims about the weather were true. When the water started to come over the dome of the car and I couldn't see where the road was, I have to admit that the weather is that bad. I backed the car down the road and I said 'yes, I guess there are times you can't get to this field.'

January came along, I reiterated my legal intent to Mr. Berquist of Interbank and to whoever else would listen ... probably Mr. Cole. I purchased some more reading material about the oil business. I contacted my friend in Louisianna for more direction and advice. Mr. Bridges, Mr. Daubry and Mr. Arnold came up sometime in January. I intercepted them at their hotel room. Mr. Arnold then told me 'he knew where the money had gone to. He was living in fear of a reprisal from whoever'. He offered to testify if he was subpoenaed, wanted to clear his name and his conscience. Pretty heavy stuff at this point.

Mr. Bridges suggested that I go with him to COPCO and meet with Mr. Nortman ... which I did. And, taking a very beligerant attitude in Mr. Nortman's office, I told him how disappointed I was and I also suggested in a peaceable fashion, after I calmed down, that maybe he could avoid some of these problems if he just did some simple PR. Send out a letter. Call the people. Once a month! Tell them you've had problems. I think people are pretty understanding in general. I also warned of consequences if he didn't take the advice. Not just my advice; but, I'm sure there were other people who felt the same way. Nothing happened!

Until, we found out in February that the program was supposedly depleted and a 10% call for additional funds provided in that prospectus reached me by mail. I turned around and requested proof of completion and production which it states I have a right to do. I also requested the annual audited financial statement. I got nothing from either of those requests.

I contacted an entity about possibly taking over as General Partner ... or at least how to go about it. I sought some more legal opinion.

March came. I went to Houston via Louisianna. Met my friend in Louisianna. He took me to Houston at my expense. We flew over and met with a man who, in fact, owned oil wells and had been in the business for forty-some years ... his sponsor, if you will, in the oil industry. And he sat and counseled me for 8 hours. Told me what to look for, what to read, what strategy to use, what objectives to be listed right to the minute detail. Told me about the Texas Railroad Commission. And, it was at that point at his urging that I decided to start contacting fellow investors.

April came and with it my birthday. The day afterward, I had my first meeting with 4 or 5 people that were in the same financial status that I was at the bank. I had the pleasure of meeting 5 strangers and telling them that our investment was in jeopardy. I explained my findings. I explained my misgivings and my doubts. On the spot, all 5 has pledged money to research the rest of it. We planned for a trip. I began research on the public records of COPCO investors because it is an Illinois corporation and they are on record

... and that's how we got your names and your telephone numbers, etc. I have xeroxed copies of that both with me and in the back in case you want to know how we did the 'hocus-pocus'. There's nothin' to it. You can go over and demand any records you want.

And we took off! Jack and I took off around the 15th of April. Jack also has photographs of this trip and we found that things like flow lines were not connected and neither were electrical outlets or boxes. There was no completion! There was no production! We only counted X amount of drilling rigs. That's not to say they were stolen; but, there sure weren't 30 drills out there ... or rigs rather. We took down some serial numbers. The flow line ... the infamous flow line ... was still laying on top of the ground and had not been buried. We checked to see if there was gas pressure. We opened some valves. There was no pressure! If there were, it would have knocked me on my derrier. We also went over to COPCO #4 where they were drilling, drilling, drilling.

We returned and phoned—in the results to our fellow 4 or 5 committed investors at that time and made a decision to retain counsel and to demand an audit.

On the 26th of April, and we have copies of this for you also, our first official request for the books and the records went out.

On May the 3rd, we had sort of a delay tactic ... at least, this is an opinion at this point. But, it was agreed that we would finally get the books and records on the 7th of May at the CPA's offices although I requested, to defer costs, to see the books and the records at the COPCO offices and I make this little note simply because later when I am accused of running-up bills, the man that accused didn't even read the damn letter that I sent him. So we walked-in and what we were given was a sheet of paper and to say that we were unhappy would be an understatement. I calmed down Mr. Elder and Mr. Elder calmed down me. We left the auditors there. They proceeded with the audit ... and I'm using that in terms of what they were trying to do—not necessarily that it was completed. We walked across the street as luck would have it because the CPA that COPCO uses is across the street from my office. We called our legal counsel. We demanded more cooperation. In the meantime, I had told the auditors to xerox everything they could get their hands on, including in particular, the cancelled checks.

At about two in the afternoon, I got a call from Jack Nortman asking me sort of to back-off and think this thing over because the cost of doing this was just going to come out of everybody's hide from the investors' money.

On the 8th, we went back to continue the audit and the missing documentation that the auditors told me was not there was noted.

On the 14th, at the auditors' request, we sent out our second formal letter for the missing records ... in particular the bank statements, the cash receipts, the deposit slips. There was no listing of assets, the payables, and in particular the outstanding payables to COPCO and also we asked for an update on any test reports. This test report thing becomes critical later.

On the 22nd, we asked for all this to be gathered-up again at COPCO's offices to defer costs. We went through the same game again and the same accusations.

Anyway, I got a call on the 22nd from the CPA firm which said there were no more records available. What you see is what you get basically. So, we postponed the audit and you have a copy which we will pass out to you probably at break and you can judge for yourself what the bottom line is there.

This brings us up to June. We had our first informal meeting out in DesPlaines. Again, it was names chosen at random and maybe through vested interests and particularly stayed away from any type of ethnic name. I don't think there was anybody Irish that I contacted for fear of any wild accusations. So we got about 5 names out of a hat and about 6 or 7 people who knew each other. So we're at about 10 or 15 people who know each other. I gave the same report and I thank The Kampka's and The Nathan's for their indulgence here and also The Druckers, as to what we had discovered factually up to this time. At the DesPlaines meeting, the concerns that came out were: 1) the lack of communication. 2) the status of the field, the pending gas contract, the lack of the audited annual financial report, the questioning of the 'operator of record' which I will explain in a second, determinations that there were indeed 13 bank accounts established for the Programs #1, 2 & 3. We discussed possible mismanagement of the funds. We

discussed the 'turnkey' situation in question. We also discussed the fact that there is no list of assets and leading into that the possibility of bogus K–1's.

I don't know how sophisticated some of you are. I know that I'm not. But, simply put, a K–1 has to have some sort of documentation to back it up. Documentation means it's got to have a financial statement and part of a financial statement is a list of assets because it has an amount of money that goes against the payables and receivables. I guess what I'm saying is that the K–1 is in question because without a list of receivables the number arrived at is definitely in question. It's as simple an explanation as I can give you. I am not a CPA.

Mr. Cole, at that meeting, asked for patience and that there was in fact a contract about to be delivered and about to be signed. Meeting closed (in DesPlaines.)

About the 10th of June, I received the records from the Texas Railroad Commission revealing that there is indeed no COPCO on the documents that are filed with the State of Texas. This is the legal entity that controls the gas and oil fields. And, what it shows in subsequent follow-up, is that we've got basically a 'daisychain' of subcontractors. It's at this point that we started to think very very heavily about having a large investor meeting ... and I've also got that documentation. In other words, on our Permits to Drill, which were in arrears and I think are already in violation of the law is what they told me at the Texas Railroad Commission, they are under someone else's name.

The President of this company I cannot find. I went through the phone book and got about 4 or 5 disconnected phone numbers before I got a consultant to ONA Drilling. Now, I'm trying to give you a historical background here without getting into too much detail. I think we have a 'daisychain subcontractor approach' to our drilling program is what it comes down to.

About this time on the 24th of June, the infamous contract appears and I get a call from Mr. Nortman and Mr. Beratini at my office updating me that they have a new contract. They threw out the pending contract from two or three weeks before; but, it's gonna need a new test to document to these people's satisfaction that there is gas there and one other small thing we're gonna need ... more funding. And that's when you got a letter for a $250 request. And also, verbatum by Mr. Nortman 'if we don't get the money, we can't go in because we have no funds in these three programs.' I left my office and walked across to Mr. Cole's office and pleaded with him for all our behalfs that this is not in everybody's best interests to see this letter go out. So, you got the letter for the additional funding and, at that time, we decided it was about time we got all the investors together that we could to tell them what we found out ... the synopsis of which, sucinctly put, is that at the best—in my business opinion—we have the most mismanaged investment maybe on record. Number 2: In legal counsel's opinion, because an audited financial statement has not been provided, we are 100% within our legal rights of removing the General Partner and seeking legal action. That's according to law on Limited Partnership Act, and as provided in our own prospectus.

So, that's historically where we sit today. We have retained counsel, as I said, Mr. Louis Greenblatt. We have copies of all correspondence that went between the requesting entity of the Investor's Committee to date.

As I get to this point, I want to point out one little thing here and I'm going to read this to you. This is a quote from a correspondence and the point of this I think will maybe ring a bell for a lot of you: 'We will begin digging the flow line trenches as soon as weather permits. The oil collection tank batteries have been purchased and installation will begin shortly. We anticipate completing all the wells in the near future.' Does anyone want to tell me what they think the date of that letter is? It's April 25, *1983.* I've had it personally! My patience has been extended and my faith has been destroyed ... not that I needed justification to go to counsel to do what I feel has to be done, but I feel I have a moral commitment to people I don't even know because they trusted the same way I trusted.

So, with that, I'm going to open it for questions. Please identify yourself so we know who everybody is."

Mr. Dieter: As an observer, do you really think that COPCO bit off more than they could chew or that they intentionally committed outright fraud?

Mr. Donohoe: Mr. Dieter, let me stop you. The word "fraud" never passed my lips until right now. Think about it. I've got a tape going to make sure of that.

Mr. Dieter: I know. But what I'm saying is that they bit off too much. They just screwed it up and it's messy and it's mean now and in order to call help _____ (?) _____.*

Mr. Donohoe: I don't know, sir. I'm asking your opinion and I think Mr. Elder would verify these facts. And, if they deviate at all from what I said at the last meeting, maybe The Nathans or The Kampkas would stand up and say 'oh no, you didn't say that at the last meeting.' Of course, we have a tape of that meeting too. These are the facts of what has happened. How you interpret them is up to you. If you're asking me a personal opinion off the record or outside, I'll be glad to give it to you. At this time, I don't think I can.

Mr. Dieter: Let me rephrase it. In your dealings with them, did it come to your attention that they had successfully managed other operations?

Mr. Donohoe: No. This is the most mismanaged business program that I have ever seen in my life.

Mr. Dieter: But, they themselves have never successfully managed anything.

Mrs. Cole: How many have you seen?

Mr. Donohoe: I've seen ten years' worth.

Mrs. Cole: Of business programs?

Mr. Donohoe: That's right.

Mrs. Cole: In the oil business?

Mr. Donohoe: No. I've ...

Mrs. Cole: How many have you seen in the oil business?

Mr. Donohoe: I've seen three, of which one had been so mismanaged it went bankrupt and I'm suffering the consequences of that too.

Mrs. Cole: You're not talking about any of the Copco programs?

Mr. Donohoe: How can I? They just started.

Mrs. Cole: _____(*)

Mr. Donohoe: I said that my opinion in business in general that I've seen, Mrs. Cole. I don't think it has anything to do with any particular business. Business as a rule! Management of a business! They are inept as hell. If they can't make out an accounting statement, I'd call that pretty poor business.

Mrs. Cole: I agree with you on that point.

Mr. Donohoe: How can I compare the record when this is the record. This is their very first program.

Mrs. Cole: I agree with you. Many of the things you say are correct. But, I think we'd better take an overview of what's going on here and maybe this is the finish line. We're getting a little too antsy. I think maybe Stan should get up and tell you what he knows. Yes, I know there have been delays and that's the problem. Innumerable delays.

Mr. Donohoe: Delays do not account for non-existent accounting procedures or records.

Mrs. Cole: Yes. Stan is a CPA. Stan wants the financial audited statement and has made a demand upon them for it. And, you are quite right on that; but, let's not lose the forest for the trees.

Mr. Elder: Look, Mrs. Cole, can I interject something? Let me address your question if I can. You asked about expertise. I will only point out what I have. I'm a Vice President within Anacomp Corporation. I have been for the last 8 years. I have participated and been involved in multiple acquisitions and divestitures within the corporation. I am responsible for a full P & L of multi-millions of dollars. I will second

this man's comments. It is mismanaged! Poorly mismanaged by any business measure.

Mrs. Cole: The problem that we have is a very good field out there. Programs one, two and three. Four has entirely suffered from one, two and three. The problems that were encountered in one, two and three because ... what did it turn into: ... Yes, a gas field instead of an oil field. Right?

Mr. Donohoe: I think.

Mrs. Cole: And these are part of the problems. A lot of what you say, Terry, are true and we appreciate it.

Mr. Donohoe: Mrs. Cole, I'm not in the position of having to defend what I've said. I'm telling you what I saw.

Mrs. Cole: Your not in a position to defend what you said?

Mr. Donohoe: That's right because it's a fact what I saw and I can prove everything I've seen.

Mrs. Cole: _____(*)

Mr. Donohoe: I want to make it clear that I don't have to defend my opinion. Alright? And, I certainly don't have to defend the facts of what we've seen and what we've already investigated and if the facts _ _____(*), show me a financial statement from these people and _____(*)

Mrs. Cole: I agree with you about the financial statement. _____ _____(*)

Mr. Donohoe: Show me a managed statement that's anything normal.

Mrs. Cole: I agree with you, but I think we need more information before we go around doing anything at this point because I think we're there at the finish line. _____ _____ enthusiasm _____(*)

Mr. Nathan: Nothing has been done since 1983.

Mrs. Cole: Interbank has been down there. Stan will tell you how many times, how many thousands of dollars have been spent trying to get this program going. You have to understand that _____ _____(*)

Mr. Donohoe: Excuse me, but may I point out that it wasn't until my threat of litigation that Interbank took an active role in this?

Mrs. Cole: _____(*)

Mr. Donohoe: Mr. Bergquist can stand up and answer that ... (with constant interruption from Mrs. Cole)_____(*)

Mrs. Cole: All of us have to be very careful about what kind of an active role you play. Do you want to be converted into a General Partner?

Mr. Donohoe: No. In fact, Mrs. Cole. (interrupted by Mrs. Cole)_____6(*)

Mrs. Cole: So, you have to let the program go for a certain period of time before you can ask for an accounting and so forth ... _____(*)

Mr. Elder: Wait! Wait a minute! We are way past the point of letting this program go. Long past it. Long past it. They are in violation of Illinois law, Mam. We could take it to the Attorney General of the State of Illinois tomorrow morning, Mam. We have chosen not to do that ... (with constant interruption from Mrs. Cole) (*)

Mr. They'll close the whole field! _____ (with constant interruption from Mrs. Cole) (*)

Mr. Elder: We don't want to do that. We don't want to do that; but, I think it's ridiculous for her to sit there and tell us that they need more time ... ____(with constant interruption from Mrs. Cole (*)

Mr. Donohoe: Mrs. Cole, let us recognize some other people for their opinions. Time out! Please!

Mr. You've asked people to identify themselves. I haven't heard anybody identify themself and we've got a lot of people talking.

| | |
|---|---|
| Mrs. Sopko: | My name is Lorraine Sopko and I'm a limited partner and I'm still waiting for the check that was supposed to come they told me at the last meeting, was September; but, I said let's wait. That's alright. Give them more time ... maybe by Christmas. And, I'm still waiting and this was in 1983 the last time we were here? In '84, I'm still waiting; but, I thought oh well the last time they gave me lots of BS. Boy, they filled my head like this; but, I thought oh it sounds good. I'm going to make a dollar. I have to work for my dollars and get up early in the morning and go to work and save and I saved and saved to get into this here thing and I believed with all my heart. I went into Copco # 4. And I'm waiting and waiting and even with the tax shelter I'm still waiting for the report. What kind of a shelter am I getting. Don't give a lot of runaround! To me, right now, I feel I've been lied to, I've been taken to the cleaners and I can just as well now go to the poor house 'cause they took my money. They turned around and they took me to the cleaners! I feel this way. I just can't help it. I hope I'm wrong. I hope I can recoup all my money back ... (with constant interruption by Mrs. Cole)___(*) |
| Mr. Donohoe: | Mrs. Cole, please, you are at a meeting! |
| Mrs. Sopko: | I believe it in my heart. I believe that it's a con and a fraud. This is what I believe. I've been taken. |
| Mr. Rosenblum: | ___(with constant interruption by Mrs. Cole)___(*) and perhaps it is a mismanaged company. And, I have to assume that if we don't get these reports, it's true. But, I think before we get hung up on an emotional situation, where it becomes a crying jag for everybody which could conceivably happen and we would accomplish nothing by doing that because all it does is feed on itself, I have one question to ask. Forgetting the mismanagement for a moment—let's just set it aside, okay—what do you know or what have you found out about the field itself? In other words, we bought management; but, we also bought asset in the ground alright? We bought tax shelter which we get but we also bought assets in the ground. We bought something that supposedly comes out. So, what is there? I'd like to know. What do you anticipate being there? |
| Mr. Donohoe: | To this day we are waiting and we have been waiting for the last four months for the completion of a second test from an independent entity. Any independent entity to confirm that there is X amount of gas and gas pressure and gas quality on our field. |
| Mr. Rosenblum: | Has the test been made? |
| Mr. Donohoe: | To my knowledge I am told through the grapevine, and that's what it has come down to, that it's being done now as I speak within the last five days because Mr. Bridges which is ONA Drilling fronted the money to the organization, COPCO, to complete this test to therefore validate a contract that's been signed. But, I've not seen a contract that's been signed. I've been told about one and I've been told about one before this and before this too. So, to answer your question, I cannot tell you because I am not a petroleum geologist nor did I ever perport to be one. So, I cannot tell you for a fact—other than the information I was given a year ago, information from a geologist's report from a Joe Galooshin and an Ed D'Aubre—that it's changed. I'm sorry that it hasn't changed. All I know is that this is what we were getting a year ago. To this day, I've been given nothing else. |
| | ___(interruption by Mr. Rosenblum)___(*) |
| Mr. Rosenblum: | What did that report say, Sir? |
| Mr. Donohoe: | It said that we had gas and oil. (Mr. Donohoe referred to someone who had the stats on this question.) |
| Mr. Rosenblum: | So, okay, so what we're saying is that unless these fellows don't know what they're doing or, I'll use the word, unless they are fraudulent, |

which let's assume they're not, the general asset that we bought is in the ground. The problem is, however, the problem is that we have some mismanagement to get it out. Is that what I'm hearing coming out of this meeting? Yes or no? Is that what I'm hearing? Yes or no! Is that what I'm hearing?

Mr. Elder: Yes. The jest of this meeting, to set the record straight, is not to determine whether or not there's anything in the ground or not. I'll be very honest with you. I hope to heck there is. Our concern at this point in time is if there is gas and oil in the ground, what is gonna happen at that point. We can't get records before. That's where we're coming from. It's not a question (interruption Mr. Rosenblum) *

Mr. Rosenblum: First of all, I want to know what's there. If there's something there worth protecting, then I want to protect it.

Mr. Donohoe: Mr. Rosenblum, why don't you do us all a favor and call up Mr. Nortman or Mr. Beratine or maybe Mr. Bridges (_____ (interruption Mr. Rosenblum) *

Mr. Rosenblum: They don't scare me. You're speaking for me so therefore I'm asking you that question.

Mr. Donohoe: I'm not speaking for you.

Mr. Rosenblum: No, the point is I don't want to speak to them. Don't send a rabbit to the cabbage patch. That's crazy. I'm talking to you.

Mr. Donohoe: I'm telling you what I found out as your fellow investor and what I found out is that there has been no change of status and all I have to go on is what I was given a year ago and I am still waiting for the new and updated ... (interruption by Mr. Rosenblum) *
_____

Mr. Rosenblum: When is the new report supposed to come out?

Mr. Donohoe: It was supposed to come out four months ago.

Mr. Rosenblum: What is the last word you heard, Sir?

Mr. Donohoe: The last word I heard from Jack Nortman was that they were going to do the retest within 15 days of the 26th of June. That was a telephone call. I waited another month, I got no call. I got no test report. I got nothin'. But, in the meantime, I got a letter requesting money. So after putting off for 3 months this great test, I found out at the end of 3 months that they didn't have the money to pay for the test anyway. That's what it came down to.

Mr. Rosenblum: Does anyone in this room have any information _____ *

Mr. & Mrs. Cole: (Spoke at same time. Unable to discern on tape.) *_____

Mr. Cole: Robert's Rule! I have the floor.

Mr. Donohoe: Let Mr. Cole answer the question.

Mr. Cole: Number one, we have a gas contract with Techlines. I have a copy of that contract in my office. I've had it there for at least 3 weeks. Alright? Fully signed by all partners. Number two, subject to the test of 5 wells, the test of the first well has been completed, the tests on Wells # 2, # 3, # 4 and # 5 are in process and are anticipated to be completed within the next 2 weeks.

Mr. _____: How many wells do we have?

Mr. Cole: There are a total drilled wells of 30. The tests, however, in order to ascertain the deliverability, etc., will be limited to only 5 wells. That's all they need. The tests are being done under the supervision of Techline and _____
_____
(unable to understand Mr. Cole on tape) *

Mr. _____: Are there any tests on Program # 4?

Mr. Cole: Program # 4 is different because it's an oil field. We are having, and have had, production and the holding tanks have to be installed. We

had a little problem on lease location because the optimum spot to put the tanks was not on the lease where we were drilling the wells so we had to get an easement from the landowner and I believe that is pretty much taken care of. And, too, the electrical work has to be completed and the last I heard the completion of Program # 4 should also be accomplished within the next 2 weeks.

Mr. _____: That's a total oil program?

Mr. Cole: It's a total oil program. No gas at all. It is located geographically with those areas on the gas field.

Mr. _____: That's what they said about Program # 2. That is was all oil and maybe one gas well. Is there a chance that ...

Mr. Cole: I don't think so because of where the wells are placed.

Mr. _____: The geologist said that it was all oil and one was gas after a complete testing. And, how much testing will it take on # 4 to prove that there's no oil, it's all gas? It could squirt a couple of gallons of oil and (many interruptions) *

Mr. Cole: (Too many conversations going on. Unable to discern what Mr. Cole said on tape.) * _____

Mrs. Kampka: My name is Delores Kampka and I just want to know that, as members of Interbank, if you and Howard Hartman who is our representative at Interbank communicate because you don't seem to be giving us here the same information we get. I talked to Howard on 7/16. He said they started bringing in the equipment on Monday 7/8 and they started testing on Wednesday. And, on the 16th; he said they should be in the middle or near the end of the test. Right now, you're saying there's still two more weeks. Okay, this is 7/16. 7/22, that was this Monday, Howard told us the test should be done this Friday or Saturday the latest, and if there were any preliminary results—because I said, Howard, they're running these tests for a while already, isn't there anything—he said you would present results, if asked, and you did. Okay. That's good. The initial results. But, the tests started supposedly on the 10th.

Mr. Cole: The tests initially were supposed to start on the 8th; but, because of equipment delays, the equipment did not come in until _____ _____ (not discernable on tape) *

Mrs. Kampka: Well, on the 16th I was told the tests started on the 10th.

Mr. Cole: All I can tell you is what I know ... okay?

Mrs. Kampka: Yes. But, we're asking for communication and apparently we're not getting the same communication that maybe your clients are getting because Howard has told us certainly different things than we have heard from you tonight. I don't know that we've progressed since the last meeting and I would like to address Mrs. Cole. Terry can substantiate everything probably with papers in hand and phone numbers to the Texas Railway Commission and everything else. He can prove every single thing he said. You tell us that we can jeopardize this because we have a proven field, you know everything is there. Why let it go the last yard? I mean you tell me. You prove to us that we have a proven field. You said "it's there"!

Mrs. Cole: The tests, as I understand, had to go forward with Techline because it was not a normal _____ (not discernable on tape) _____

Mr. Cole: The testing is not to determine the quality of gas. It is to determine the deliverability of gas. Techline will determine how much gas will be taken out. They want to sign the contract with some of the volume. That's what we're trying to ascertain.

Mrs. Kampka: I just have one more question. In talking to Howard, I have kept on his case since the last meeting saying when are they going to do this test to the point where he finally said to me that I'm putting too much emphasis on this test. And, then all of a sudden. no, it's important

that we get this test done because the glass company would not accept....＿＿＿＿＿ (interrupted by Mr. Cole)＿＿＿＿＿

Mr. Cole: Remember, we had some delays because of the letters that went out requesting monies to come in. We went and got Dennis to do something else. This took another week ... etc. ＿＿＿＿＿ (not discernable on tape)

Mrs. Kampka: All that aside, Howard said, if I'm not mistaken, that the test had to be completed by the 22nd because....

Mr. Cole: There will be a letter from Techline extending this, that date.

Mrs. Kampka: It isn't Techline that I'm concerned about. It's the glass company that's supposed to be renewing their contract with Lone Star Gas 8/1.

Mr. Cole: Okay, but it's Techline that in effect has to provide that gas ... etc..... (unable to hear on tape)＿＿＿＿＿

Mr. Donohoe: I'd like to focus back on the issue. Mr. Rosenblum, there are other people with their hands up.

Mr. Rosenblum: But, I just want my original question answered. He still hasn't answered by original question.

Mr. Donohoe: He hasn't answered mine either.

Mr. Rosenblum: Is there any reason to believe that the projections, as shown in the prospectus, will not be reached?

Mr. Cole: Alright. I feel that Program # 4 projections will be reached. # 1, # 2 & # 3 is gas. Okay? The quantity and deliverability of the gas, I have my own feelings ... overall return etc. ＿＿＿＿＿ (unable to hear balance of answer on tape)＿＿＿＿＿

Mr. ＿＿＿＿＿: Did you get an actual reading on that first test? As to what the capacity was or the output?

Mr. Cole: I am told that the open-flow test on Well # 10 was 1.7 million per day.

Mr. Nathan: Where is Well # 10?

Mr. Cole: Well # 10 is the well in Program # 1 that was the first big well that was hit.

Mr. Nathan: That was supposed to be the gas dome. Is that what you're saying? You're saying we have gas in it?

Mr. Cole: Yes! 1.7 million on a 24 hour open-flow test.

Mr. Donohoe: Mr. Elder would like to address that point.

Mr. Elder: I'll bring this up. Let me address this to you, the question was asked. We've had multiple engineering reports. My point is that none of these reports seem to coincide with one another. And, I will state this. This is a copy of a report from Mr. Galooshin. This is dated 7/2/84. It says: "Proved oil probable & possible. Gas proved probable and possible". And, what it shows is one tremendous amount of oil we're going to get out of Copco #1, # 2 & # 3, and very little gas. That's the thing we raised the issue about. Nothing seems to coincide. Would you like to look at this?

Mrs. Cole: What is the point? I don't understand what the problem here is?

Mr. Elder: The point I'm making here, Stan, is the question was asked what do we want?

Mrs. Cole: I don't understand. You don't know what you're going to get until after you drill.

Mr. Elder: Excuse me. This report was done after the drilling. It's dated 7/2/84. It's dated by this particular engineer 6/28. The point is we're sitting here and you're sitting back there saying "yes, we have proven reserves, we have this on this there ...", yet I can pull out three reports, I've got them, and every one of them disagree with the other. There isn't one geologist report that we have received from COPCO that agrees with the other. They vary across the board.

Mr. Cole: First of all, you only have one geology report.

| | |
|---|---|
| Mr. Elder: | No, we don't Stan. I have three. I'll show them to you. I have them with me. I have three geologists reports that were sent out by either you or COPCO or both and I'll show them to you. |
| Mr. Cole: | There was one geological study by Joseph Galooshin and at the time the survey of the drilling _____ * _____ and at that time, based on the survey that was done, Mr. Galooshin released his estimate of reserves ... except he could have been off 100% in either direction due to the _____ amount _____ (undiscernable on tape due to low voice & interruption) .* Subsequently, Programs #2 & #3 have been drilled and pumped and turned to gas. Now, one of the requirements that have to be accomplished will be an update of the geological reports based upon the data that we now have in hand. And, that is something that has yet to be done. After the testing is finished, there has to be another reserve report by an independent geologist bringing up to date the results of the findings based upon the tests that are now being done, much more extensive than what we have known in the past _____ * _____. Remember, that what we've got here is a new field discovery. Therefore, until the field has been completed and properly tested, it is difficult to ascertain with a tremendous degree of accuracy what we've got. More testing has to be done _____, wells have to be _____ * now that we have done the drilling through the entire acreage, the estimates of gas reserves can be done in a much more accurate manner. Now, whether or not there _____ _____ ** after the gas has been played out, this is complete conjecture at this point because we don't know how long the gas _____ _____ ** will happen underground and that's something that will have to be ascertained at a later time. My own feeling, all the way back _____ ** I always felt the gas reserves were substantially more than _____ _____ **_____. |
| Mr. Donohoe: | We have a question in the far back and after this question I'm going to make a statement and we're going to take a break. |
| Mr. _____: | _____ _____ ** _____. |
| Mr. Cole: | I would say that ... |
| Mr. Nathan: | I can't hear you. Would you please stand up. I can't hear you. |
| Mr. Cole: | I would say that a lot of the problem has been the delay caused by the new field discovery; but, on top of it, there has been a lack of communication between the General Partners in the business. This is something that I have commented on many times to the General Partners to little avail. Number two, I would say that the audited financial statement of the partnership, which is something that is in the prospectus, and until those audited statements are issued, we think there's a _____ ** of complaints _____ _____ **_____<br><br>As far as the spending of the money, we have a "turnkey" deal here and as long as the wells are completed I think that the terms of the turnkey are satisfied. |
| Mrs. Sopko: | What is the "turnkey"? I'm not _____ * it. I want it back. I don't want _____ no more. |
| Mr. Cole: | Basically, the way the programs were structured is that we raised a specific some of money to drill and complete a specific number of wells for those dollars. As long as those number of wells are completed, the terms of the "turnkey" contract have been satisfied. How much profit there will or will not be that is ... _____ (not discernable on tape) _____ * |

Mrs. Sopko: Well tell them to stop.

Mr. Cole: Okay. The point is this. The reason you do a "turnkey" is this. When you start drilling oil wells, you don't know exactly what problems you'll find and so we try to structure a turnkey is to ascertain what the reasonable amount _____ _____ ** _____. If the wells are drilled and the actual cost is in excess of the monies raised, the General Partners have to pick it up. If the wells come in for something less than _____ _____ ** _____, that is additional profit. In effect, the object is to give the investors a specific number of _____ ** for a specific number of dollars. _____ ____ (Mr. Cole was seated in back of the room away from the tape recorder and it was, therefore, more than difficult to understand or hear him).

Mrs. Sopko: We didn't get anything from # 1, # 2 and # 3. Why bother with # 4?

Mr. _____: _____ ** and let's get somebody in charge of our management situation. Let's get this thing in the hands of somebody that knows what they're doing._____ **

Mr. Cole: I feel that as a group _____ _____ ** Number two, to get rid of the General Partners is not just a simple statement because you have to find an adequate replacement for them ... someone who is in the oil business and understands, and number three someone who would want to step into a situation like this.

Mr. Donohoe: I'm going to cut you at this point, Mr. Cole, because we have a break scheduled. During this ten minutes, I prefer that you allow someone else to raise some questions. I want you to consider three points. What are the assets of this company, where are they? Where's your statement? Is the K–1 you filed with the IRS real? What kind of tax problems have you incurred that you might not even know about? Consider those three points while you take your break. We'll resume in ten minutes.

_____INTERMISSION_____

Mr. Donohoe: Perhaps we can start here and hopefully be out of here before 10pm. I promised Mr. Jensen, who was patient, that he would get the floor first. So let's begin the proceding.

Mr. Jensen: I'm going to come up here so I can see the people and they can see me. I learned many years ago that it's better to keep your mouth shut and let people think your crazy than it is to speak up and _____ _____ *. Now, I don't know a thing about oil but I have a very substantial experience in business in general. And, it seems to me that there's a couple of _____ ** that needs to be put in context in order to develop an acceptable area. There is no doubt in my mind but that the General Partners have failed us as investors. _____ ** in the prospectus that re- quired them to do certain things that they have not done. For the purpose of the tape recording, in my opinion, those are the facts! Also, what I don't want you to lose sight of is that officers in Interbank are also limited partners in the whole pile of _____ _____ **. So, they have a personal stake in what's going to happen here just as you have. If what's been said up 'til this point is true, then there is only one solution and that's to get rid of the General Partners. It's that simple.

**338**

When do I as a businessman find out that an employee has done something wrong? Number one, when he goes on vacation and someone else takes over or number two when he's gone. It is when the General Partners are gone and somebody else takes over that we will find out whether in fact there is misrepresentation, whether in fact there is no IRS reports, whether in fact there has been withholding of funds. _____ ** So, really in fact, this is the direction we have to go. At the same time, I don't believe we want to jeopardize our own individual investment procedures. We are about, as I understand it, to find out test results, and those test results are going to tell if there is something there or not. That's the point _____ that we have action _____ the General Partners. That's my opinion. Take it for what it's worth. Thank you.

Mr. Donohoe:

I'll make a comment to Mr. Jensen's. When faced with making this presentation tonight we had many different decisions to make, one of which was putting things in perspective. So, we went through that little game of giving you the history of how we did this step by step simply so people would know that it was a random, ill-advised, illogical shoot-from-the-hip approach. I think we have substantiated that and if I haven't then I've accomplished nothing. Jack & I have wasted a lot of time. But, we can document each and every statement that we've made. The second problem we had was how much information could we give out faced with certain unescapable issues. And, there are so many instances that can border on fraud that it's easy to sort of get confused and get unfocused.

So, while suspending the question of whether or not the General Partners are doing their job, we've been side-tracked with this more recent concern of is there in fact a valid investment? And, this is certainly the whole point of the issue. If there's nothing in the ground, and I want to interject one personal note, deep from my heart I really wish that I had never met any of you at all unless of course it was on a plane going to Hawaii and I happened to mention to you that my investment bought me this ticket to Maui or Hawaii because I invested in COPCO. This is not my idea of a good time. This is not my idea of a successful business venture. This is not my personal idea of what I want to do with my life because it's been 24 hours a day for quite a few months.

I have no intentions, whatsoever, of going into the oil & gas business, in any way, shape or form. I'm a successful steel broker, and damn proud of it. In a hard market, I've survived. I've got a pretty good thing going. I don't need this crap and I sure don't need this frustration. That's a personal note from my heart. If this thing gushed gold, I'd be the happiest SOB alive. Unfortunately, none of that has taken place. So, we come back to the issue. Yes, nobody, I think, in their right mind is not going to concede that two or three more weeks of waiting is not in the best interest of their own personal investment ... much less the group. We waited this long, we can certainly wait two or three weeks longer. Of course, now that happened last month, and the month before and the month before that; but, this time I'll concede that there is a light at the end of the tunnel, that there has to be a result or we have one or two choices to make.

But, I want to update now some factual information on just how badly managed these people have done. We know about financial statements, know about SEC violations, the possibility of bad K-1's. To this date, there is no list of assets. I don't know where the money has gone, frankly, and I want you to get the point "turnkey" does not mean carte blanc. I don't care how you say it. It's limited to a reasonable profit not a ridiculous profit! There is misrepresentation of the AFB which none of you even know what that means and I'm not going to even explain it to you until another date.

Mrs. Nathan: What does it stand for?

Mr. Donohoe: That's a little number that they made out for equipment costs and it's handed-in by ONA to COPCO in effect telling them what they're buying and what they're selling and what they're using the monies for. There is no listing of equipment costs. The operator of record turns out to be a sub-contractor who I still can't find and I'm down to my sixth phone call. I'm not saying that's a bogus entity; but, they are on record at the Texas Railroad Commission. Does anybody know who George Holly is? Does anybody know his whereabouts? He's the President of #1, #2 and #3 and Production Research Inc. and that's in effect who runs the program ... not ONA, not COPCO and he's nowhere to be found by the way, at least to my knowledge.

There's the issue of 13 bank accounts. Now, I can give you the numbers through which 2 million dollars, or thereabouts, has been spun-in & spun-out. The question of co-mingling of funds, the correspondence when and if it came through, the claims that were made for field completions that weren't completed, mismanagement of the sort that goes out and buys storage tanks when you don't need any storage tanks when you're pumping gas, flow-lines and you don't need any flow-lines when you got no gas to pump. Things that you'd think that someone associated with oil in some way would have the foresight to know about.

And, so we get down to the final question and, at this point, I'm probably going to relinquish the floor. I think the ultimate point is that in this prospectus, and it was very cleverly written. Some portions are very poorly written, in my opinion, and I've read a couple of them just to make sure that I knew what I was talking about. But, one of the reasons that I think that I have a bone of contention here is that this great gas contract that has been renegotiated on our mutual benefit, taking ONA Drilling or whoever else was involved out of the middle, Tangram, that didn't come from the heart. If you looked it up in the prospectus, there's a 10% sales commission that goes to the General Partner as sort of a little added incentive for doing a good job. In other words, if the contract is good and the tests are good, and we do sell the gas, they're entitled to a 10% sales commission on it. That's for doing a good job. I ___(interrupted by Mr. Cole)___ *

Mr. Cole: That's bullshit. That is stipulated to be upon the sale of the field.

Mr. Donohoe: No. Not in the part that I read and I'll ...

Mr. Cole: That appears in one program only.

Mr. Donohoe: It appears in the one I read and that's good enough for me. Yes, and that is the one that I read because that's the one I'm in. But, let me finish my point here.

Mr. Cole: No. I'm tired of listening to unfounded dees, dems & do's ...

Mr. Donohoe: Well then, leave Mr. Cole.

Mr. Cole: Unfounded!

Mr. Donohoe: Unfounded? Let me tell you how good they managed. They managed it so good that the generator has been removed after they bounced checks and they're three payments in arrears. So, there's no generator on top of that hill and I think that is the creme-de-la-creme of mismanagement. In other words, they did such a great job of managing this program that they came over and picked up the equipment and took it back because they either couldn't get the checks paid that they had bounced or they didn't make the payments at all. And, right now, there's a lawsuit about to be filed against COPCO for that very issue. So, I think, in closing, my ultimate remark is these are the poorest managers that I've ever encountered. I wish to hell that I'd never invested in this program.

Mrs. _____: Why?

**Mr. Donohoe:** If you want these kind of people to manage my money, if you want them to manage your money if we do get lucky enough to hit gold here—black gold, gas gold, any kind of a thing—that's fine for you; but, I don't want to have a thing to do with these people. And I've already made up my mind. Those are the facts as I see them. I yield to Mr. Elder.

**Mr. Elder:** Here's some objectives. We talked about objectives we want to accomplish: We want to complete the financial audit. We want COPCO to give us everything that we have requested. You do not have an audited financial statement in your hands. You'll notice on the back table there are some papers that we gave you. You'll read that Poulos & Bayer—the statement that they make—that it is not an "audited" financial statement. We want an audited financial statement but we want to complete the one that we started. We believe we're capable of doing a better job of auditing their books at this point in time than anybody else because we've been in the middle and we want complete reimbursement by COPCO—not out of the Limited Partnership—but out of the General Partnership. They have not given us that. If you will look on the financial statement or on the audited sheet, it's called Consolidated Operating & Production Corp., our report dated May 1985, on the back. If you will go to that. It's a hand-out.

If you will go to number two, Roman numeral II "Assessment". This was done by a CPA. The gentleman's name is Raymond Yee, Certified Public Accountant. He is the gentleman, along with the accountant—Terry's personal accountant for his business. We had two accountants perform this audit. This is a statement by Mr. Yee. We'll go to Number II "Assessment", and I think it makes real interesting reading, "Copco has no balance sheet, no general ledger, no fixed asset ledger, no cash receipts statements, no income statements & accounts receivable & payable ledger." What kind of a business is that? The basic fundamentals of running any business and they don't exist! We want that statement finished and we want to see these. We want to see them in their entirety and we want to publish them for every single investor. That's what we're asking. That's what we want your backing on. We want the test results published to all of us and, Stan, you committed to three weeks. I will challenge you. You sat in a meeting on June 5 in my office in DesPlaines, IL., and at that point in time you told us we were 3 weeks away. You sat there with my wife, with Terry Donohoe, with John Schultz, and the rest of us, and at that time you told us we were 3 weeks away. You also committed on Interbank stationary to publish those results to us and get back to us with the findings. To this date, we have seen nothing from you!

We would like to see a permanent solidification of the COPCO Investment Committee. We would like your backing on that. A committee that will stand and look out for your rights. I think it's very obvious that nobody else is doing it. And, certainly not the General Partners. It's certainly not ONA. Nobody else is standing up. We would like to do that. At this point in time, I don't have a vested interest if I'm on that committee or not. I would like to see it composed, and we would like to see it composed, of between 5 and 7 individuals who will look out for the best interests of this group at least until something is decided relative to the General Partner. Also, we would like to see, and we will have to set up, some kind of financing for the continued work for lawyer's fees or whatever is required for that particular committee as we go down the path on this. I'll open it up to any comments.

**Mr. Donohoe:** I am making correction on a statement. There is not investments in violation. It has been corrected. There was a late filing. However,

there is a violation of the State of Illinois in some of the filing that didn't take place or hasn't taken place.

Mrs. Kampka: The filings were at the State of Illinois Securities Division. Terry, that is what we mentioned at that meeting. They had not filed their annual report. They _____ (interrupted) _____
But it was finally filed on May 3rd. It was late; but, it was filed. It's just another case of mismanagement. To my understanding, in talking to a gentleman at that office today, any corporation is given 60 days notice in advance of their need to file and pay for their corporation fee, or whatever it is and our question is what kind of attorney is retained by COPCO that with 60 days notice they can't file a simple statement that just lists officers, assets—not even financial assets—just list the number of shares or how they were established or whether there was any change and that too just speaks of the management or lack of management of this company.

Mr. _____: Have you approached COPCO or the General Partners of all this?

**

Mr. Donohoe: Mr. Nortman & Mr. Beratini's telephone call to me was on the 24th or 26th of June and was made out of courtesy because "because I represented the most vocal of the investors in committee". At that time, they told me about their plans to conduct the tests but that they didn't have the money to conduct the tests and if they didn't come up with the money that they were looking at bankruptcy as an alternative." And, that's a quote from Jack Nortman. I went to Mr. Cole and suggested that there had to be an easier way to circumvent this problem without rubbing salt in the wound of the investors. He agreed. However, they had already sent out that letter to all of us and Mr. Cole informed me that Mr. Bridges fronted the money and I eluded to that earlier.

Again, reiterating ... Nothing would have made Mr. Elder happier, or Mr. Donohoe, than to be receiving checks and not to have met any of you. I will not be on the investment committee because I have already volunteered my time, my energy and my experience in investigating these things. I've made my 3 or 4 trips. But, I think it's in our vested interests to seriously consider the ramifications of what is, without doubt, mismanagement.

And, correcting a point earlier made by Mr. Cole, there are 36 holes or wells, rather, according to The Texas Railroad Commission that have been drilled & permits issued, not 30. The significance of the number I don't know. I don't know if it even has a bearing on the conversation. But, I am in receipt and have in fact the records of the permits. Here, again, we're in violation because the permits are only good for twelve months, and we have long since gone over that date. Without _____
(interruption from Mr. Bergquist)

Mr. Bergquist: The permits were already drilled. The wells were already drilled.

Mr. Donohoe: Yes, but they were not drilled within the time allotted that. I was told by The Texas Railroad Commission that the follow-up results, if they were drilled, were not filed. So, to the Texas Railroad Commission, nothing came out of the ground. There were no results. That's the bottom line on that. Now, you can call them if you wish and I urge you to do so; but, to The Texas Railroad Commission, there was no results on those drilled wells. That's what they tell me on the phone.

Mr. Bergquist: You also stood at the last meeting and wrote "VIOLATION" on the easel and said there were no permits. You ridiculed this man when he said "did you check under all the names?" And, you said "of course I did, I'm not that dumb, Mr. Cole". Two days later, we find out they exist and I go down to Texas personally and pick up copies of all of them. And you made a factual statement that to the best of your

knowledge they didn't exist. Of course, you checked it all out. Now come on Terry.

Mr. Donohoe: That's right. To the best of my knowledge, they didn't exist. Of course, I didn't look under bogus names and other people _____ _____ (interrupted by Mr. Bergquist) _____

Mr. Bergquist: Bogus names! It's the Operator that is in the prospectus. It was the original operator of the program.

Mr. Donohoe: Show me the name in the prospectus.

Mr. Bergquist: Give me the prospectus. I'll show him the name, God damn it!

Mrs. Kampka: Terry . . .

Mr. Donohoe: If you were that knowledgeable at that time, why didn't you jump forward and tell us that's who we were registered under?

Mr. Bergquist: I didn't have specific facts at the time.

Mr. Donohoe: Well, neither did The Texas Railroad Commission.

Mr. Bergquist: You don't make statements at a public meeting that end up being totally false!

Mr. Donohoe: They end up being corrected when I said they are listed under another company.

Mr. Cole: Alright, and tonight, you made another group of accusations. Now, we'll follow these up and find they're totally false!

Mrs. Nathan: Terry . . .

Mr. Bergquist: Here! Production Research of Texas, COPCO, Dear Mr. Beratini: This letter is to serve as our offer to act as Operators on your lease in Navarjo County. Cecil Holly. He was the President of the Company that was the operator at the time and that's the name that the permits were under. They are no longer the operator.

Mrs. Kampka: Where is he?

Mr. Donohoe: They got fired. But they were paid. They were paid to do a job and we don't know what they were paid, and if they were paid, or where the money went, right? See, what I'm getting at here, Kurt, is under the (interruption by Mr. Bergquist but unable to discern what he said) * inuendo, I'll make it very blunt. I think we have more than just mismanagement here. Alright? More than mismanagement!
And, if you will, there's a web that's been woven by individuals in this particular investment group and I'm going to get to the bottom of it . . . whether I do it myself or with other people's help. I've got a lot of people helping me now.

Mrs. Kampka: Terry, excuse me. Are those initial permits that you were saying have the 12 month life, those were just to drill and see if there was anything in the ground?

Mr. Donohoe: Right. And, there was no follow-up documentation whatsoever. Now call them up and see. Maybe they'll find it under somebody else's name.

Mrs. Kampka: Okay. Terry, say in fact they did find something. This is just a supposition, and there was oil but they neglected to file it, shouldn't they have gotten some kind of a permit to put a permanent well in the ground?

Mr. Donohoe: According to what they told me on the phone, yes. But, there again, why doesn't somebody call up and check it out. I am not a petroleum or oil field engineer expert; but when we have no communication from our illustrious General Partners, I went personally and begged them to keep us informed to avoid these kind of frustrating moments. Here we stand 7 months later. Alright, if I erred on the side of overeagerness, fine . . . I'll admit a mistake. Tell me what happened to the generator and the money we already paid for the generator?

Mr. Bergquist: Seeing as you just brought it up tonight, I don't have an answer. If you'd like us to get one, yeh, we'll attempt to do that.

Mr. Donohoe: Please. Do that.

Mr. Elder: It seems, Kurt, we're always bringing things up to you. The last meeting it was the same way. We hit you with some things. Excuse me ... excuse me ... (interruption) *

Mr. Bergquist: You made a statement that they paid $17,000 for a pumpjack. I said 'gee, maybe it was ten.' Terry said "no, no I saw that. It was this little scrap of paper. It was for one" I went down to Texas. I saw the invoice. Yeh, they cost $1,700 a piece, not $17,000. It was for ten. But, you keep making these statements in front of a group of people who don't know all of these facts and don't have the opportunity to secure any rebuttal?

Mr. Donohoe: Well then, Mr. Bergquist, you are probably more knowledgeable about these things than we are. How come, as an investor, I can't get my right fulfilled to see the ledgers of the company? I asked legally for it. I gave them due recourse to provide the paperwork for it and of course they didn't. You know, you're mixing apples and oranges here. There is still no financial statement, there's no list of assets, there's a violation of Illinois State Law. Speak to that issue if you want to speak.

Mr. Rosenblum: What is the violation of State Law?

Mr. Donohoe: Legal counsel opinion guarantees us that we are 100% within our rights in requiring, according to the prospectus and the Limited Partnership Act, annual financial audited statements.

Mrs. Cole: We agree on that.
Mr. Bergquist: We agree. Okay.
Mr. Donohoe: That's the violation. It hasn't occurred. You want the violation ... There it is.

Mr. Rosenblum: Before we start getting emotional again and mixing up apples and oranges, I think frankly we should compliment you on the work that you've done and I also feel that sometimes mistakes can be made Terry. You're human. Right? So what? What I think is important and we've glossed over this real quick and before we lost sight of it I want to ask you a couple of questions: I don't know any of the answers. You know a helluva lot better than I do. This was, in fact, a "turnkey" operation, quote/unquote, which was the word you used before.

Mr. Donohoe: Correct.
Mr. Rosenblum: Which means *** (new tape inserted. Lost some of question by Mr. Rosenblum) _____

... for the amount of money which I paid. Right? That's what I am entitled to. I am not entitled to oil in the ground. I am not entitled to gas in the ground. I am not entitled to a damn thing down there. We're at risk. That's what your prospectus said. That's why the IRS gives you a tax treatment. You're at risk for the amount of money you put in. If the oil is there, you make money. If the oil isn't there, you lose money. Alright. There is no other way to look at it. Otherwise, everybody would do this and everybody would get rich. Obviously, so let's not lose sight of that fact. So the real question is two things ... two things, and I think we're in agreement on both of them. 1) Were the wells completed for the money regardless of the problems and the floods and the generators and the pipes on top of the ground. It doesn't mean a damn thing. Was it finally completed for the dollars? If not, what has to be done? That's number one. Okay. 2) Is there anything down in the ground when we're done with it? Okay? Once we're done with that, I don't think anybody in this room disagrees with the fact that there has been mismanagement. Okay? I think everybody here agrees. I do.

Mr. _____: Is that acceptable?

Mr. Rosenblum: No. It's not acceptable. Let me finish. And you said, you agree, we were talking in the hall, that if in fact there is product there, we want

to protect our investment. We want communication. We want a committee to oversee the General Partner or maybe we don't want this General Partner. We all agree to that too, I think. So, the question really is number one, taking it step by step, have the wells been completed or are they at a virtual substantial state of completion at this point? I'm asking a question. It's a yes or no answer.

Mr. Donohoe: The answer is according to COPCO, the wells have been completed. According to what I saw personally, if the flow-line isn't connected, I would hardly call that completion. However, there is a greater issue and I just want to interject this. As far as the assessment, the 10% call goes and it's written in the book ... (**)

Mr. Rosenblum: You don't have to pay the 10% call if they don't give you what they said they're going to give.

Mr. Donohoe: Completed and producing. Producing! Not production. Production to me means that there is something flowing.

Mr. Rosenblum: That could be at the end of the month.

Mr. Donohoe: But, there was nothing flowing. I saw no production. I am not a petroleum engineer; but, I saw no production.

Mr. Rosenblum: Let's get to the audited statements. This is more important. And, it's their duty to do that. Alright. We all agree to that too.

Mr. Donohoe: So, if the field has to be in a state of completion, and I'll make it that simple, turn a valve and something does something.

Mr. Rosenblum: That's "Turnkey".

Mr. Donohoe: Alright. I don't think you'd turn a valve in that field and anything would happen to my knowledge. Maybe you could turn a valve and you could get knocked backwards because of gas pressure. I don't know. I don't know. So, is the field completed? I don't know. And, to answer your second question, what is there in the ground? We won't know until the two or three weeks.

Mr. Rosenblum: We have to wait that time again.

Mr. Donohoe: I guess we're going to wait two or three more weeks. But regardless of the results of that, and I don't want to mix the apples with the oranges, I hope it's gold that comes out; but, I'll be damned if I'm going to let somebody manage my portion of that investment.

Mr. Elder: Let me add something to this. There is a letter dated March 6, 1985. According to ONA, it is "Turnkeyed". The exact statement is: Programs 1983–2 & 1983–3 were "Turnkeyed" on January 29, 1985. ONA is going on record as having said we've completed it, we're done. That's what it says.

Mr. Rosenblum: Once they've turnkeyed it, as far as that portion of his agreement, the General Partner has lived up to his agreement. He may not have done it the way you wanted him to and he might not have done it expediently; but, he did it. Regardless of how many contractors he uses. So, that's not the issue. The issue we really have here and everybody agrees, it's difficult to get everyone in one room to agree but everybody agrees here, that there's been no communication between COPCO, the General Partners, and the Limited Partners. None whatsoever. There has been no communication. Okay. Limited communication.

Mr. _____: What communication there has been has been way off.

Mr. Rosenblum: Okay, so we want communication, number one, and we want to see what we're entitled to. Everything it says here. We want to see financially. We all agree to that too. I don't think anybody said they don't want to see a financial statement, did they? So, there's three things we're gonna have to get done and this committee's gonna have to see that it gets done: 1) The Statements. 2) Ongoing communication, not a note that's thrown in the mail once every six months and 3) some type of verification of test results so we know what we're

dealing with. And then, I agree with you 100%, I don't want him looking after my stuff because he's proven that he can't do it.

Mr. Donohoe: Now, let me ask you a question in return. If you were going to ask for people to consider to remove the General Partner, don't you think you'd have to substantiate your position by factual representation of mismanagement?

Mr. Rosenblum: No! No! The Limited Partners get together and say we don't want this guy and we don't have him.

Mr. Donohoe: Well, I'm a little different. I want to prove and I want the people to know.... (interrupted)

Mr. Rosenblum: Why guild the lilly? If you've got the right to throw the guy out, then throw him out!

Mr. Donohoe: Because you could do that on a whim ... you could do that on a whim.

Mr. Rosenblum: Sure. If I've got the right to throw the President of the United States out on a whim, then I've got the right to throw Mr. Nortman out on a whim. He's a little lesser individual.

Mrs. Sopko: Well, who's gonna be the General Partner?

Mr. Rosenblum: I don't know.

Mrs. Sopko: I want to be. Why him? I want to be. I wanna make 10%

Mr. _____: What knowledge do you have about the oil business?

Mrs. Sopko: I don't know nothin'.

Mr. _____: Neither does Mr. Nortman.

Mrs. Sopko: Then why do you fight him. What he found out is very interesting.

Mr. Rosenblum: But, we're all in agreement, Mam, don't you understand that? I might talk loud because I'm a little deaf; but I'm not disagreeing with the man. I'm agreeing with him. The man is right. And, so is he. Everybody is saying the same thing here. Except we're saying it in different ways. That's the problem.

Mr. _____: Except I'd like to know why they are being replaced?

Mr. Sopko: I can say this. If you drag it into the legal end with the General Partners, it's gonna cost you more money than it cost you to drill the damn holes. And forget that! If you're gonna get rid of a General Partner, you get rid of him the easy way. I've had 13 years experience. I've been in four defunct tax shelters. We moved the General Partners out. We did everything we had to do. If you get into the legal end of it, it's going to cost you more on the legal end of it than it cost you to drill the damn holes.

_____ The room got very noisy. Everyone began talking at once.

Mr. Rosenblum: Please. Let's get something straight. You do not have to remove them for cost. 51% of the Limited Partners vote and say goodbye and that's the end of it.

Mr. Donohoe: Time out! I read it too and I know you don't have to have cause. That wasn't the point of this meeting to say these are reasons and causes to remove the General Partnership. These are reasons for concern on how to monitor our investment and that's what the letter said.

Mr. Rosenblum: Okay.

Mrs. Cole: But, at the right time, you might want to consider getting a new General Partner. It may not be the right time.

Mr. Donohoe: But, in the meantime, we still have to get some other solutions to the problems that are very real. Now, I'm not going to sit here and wait for them to finish an audit or a financial statement or whatever else because they're not going to do it! And, And number two, mark my words—and I have nothing to substantiate this with—it's just kind of a gut feeling: Strike oil in # 4 or any other program and it starts to produce revenue, they get paid the revenue. They disburse the money. And, I'll bet you anything that you will be amazed at what

happens to the money that goes back into that partnership. And, that is my concern.

Mrs. Cole: You have a good point there. It's our concern too.

Mr. Donohoe: The worst thing that could happen is that it is a successful investment because you know what's going to happen then? You think they blew through two million dollars ... wait 'til you see what happens when the money starts comin' in the next go-around.

Mrs. Cole: _____(unable to hear on tape) _____

Mr. Donohoe: There's no records of their spending, Mrs. Cole.

Mr. _____: Don't you have records of what they spent?

Mrs. Cole: _____ (unable to hear on tape) _____

Mrs. Donohoe: I'm not satisfied with giving them a carte blanc Turnkey situation.

Mrs. Cole: That's what you did when you went into the deal.

Mr. Schultz: But Turnkey doesn't mean you don't keep records?

Mrs. Cole: That's true. That's absolutely true.

Mr. Cole: And that's why they are required to provide us with an audited statement.

Mr. Rosenblum: That's true; but, if it cost him $1.00, one buck to drill that well, the rest of the money's his by law and by the same token if it cost him ten million dollars to do it, that's his problem. But, and I also agree with this gentleman sitting right there, without getting all screwed-up, having been down the road quite a few times myself, thank you, rather than get screwed-up in a legal battle where the only people that are going to make money out of this thing are going to be the attorneys and we're all going to be sitting here going around in circles, alright? I don't believe in that when I've got an absolute right to do it just by saying hey fella you're gone! I don't care why. You're gone! Then he can't say boo. That's it. You're gone. We're in. You're out! This man here is gonna be the general partner, some man, not me, and that's the end of it. Or, this lady's gonna be the general partner.

Mrs. Sopko: No.

Mr. Rosenblum: I do not want to get involved in lawsuits for one reason. The most insidious bastards are, not are but can be, lawyers. And what happens is you get a bulldog and then the other guy gets an equal and opposite bulldog and then the two bulldogs start to fight and pretty soon the Limited Partners and the General Partners are out of it and the lawyers are trying to score points. I don't want to make points for anybody. I want to make some bucks for myself and my people or I want to walk away and get the helluva out of it and kiss-it-off!

Mr. Elder: I agree.

Mr. Rosenblum: And, therefore, what I want to do is, and I agree with you 200% not 100%, when we get those reports and those things kick-in, I want Mr. Nortman gone and I'll call the next meeting if I have to. I've got a right to remove him and I want to remove him. That's all! I don't have to have any reasons. Because what happens later is that all the Limited Partners get together when the oil starts to flow-in and say well he really wasn't such a bad guy. And, then a year from now you're all gonna be sittin' there. It's gonna be the same thing all over again.

Mr. _____: Do we have a replacement in mind?

Mr. Donohoe: Yes. We have recommendations on who it could be. I still don't know whether you can remove somebody on a whim or not. You don't walk into a room of 50 or 100 strangers and say I think we ought to remove the General Partners because we are all unhappy. Now, maybe some of you may have thought we could do that; but, I don't work that way. Alright, and that's why we're going through all these step by step programs and hopefully at the next program when we find out what some of the results are at the next meeting, somewhere down

the line when we have all these results in front of us, we'll be able to solve one problem ... and that is that there is or is not a valid gas or oil program. This wasn't called to sequester 51% of the people to throw somebody out tonight. This is an information meeting and this is the update that you should have got from your General Partners, but you didn't. And, it won't die at this point because the people that are involved are still going to be involved. I'm going to ask for contributions to see that the committee oversees whomever the General Partner is because no matter who is in the driver's seat, so to speak, if we're not looking over their shoulder this will just go on and on and on. And, that's the point.

Mr. Cole: Don't you think that we have to get some kind of valid production report _____ by 51% _____ (unable to hear on tape) _____

Mr. Donohoe: I would think so, too. But, as I said, I don't see anything on that letter that said that this is a meeting to throw out a General Partner.

Mr. Cole: But I'm just stating a general point. If you want to have an overseeing committee, then you should _____ that speaks for the majority of investors.

Mr. Donohoe: And we have no formal committee perse' and as I pointed out earlier for lack of a better term _____ (interruption) _____

Mr. _____: Were all the Limited Partners invited to this meeting?

Mr. Donohoe: To the best of our knowledge, given the information on the documents from Illinois, based on what we found out, we sent out—and hand addressed them—letters to each one based on that address that was current at the time they joined the program. Now, I am sure that everybody was not reached.

Mr. _____: Couldn't you get that info from Interbank?

Mr. Donohoe: Frankly, up to that point, I didn't know for sure that Interbank was in a position or a mood to cooperate with forming a committee.

Mr. _____: I understand that the COPCO Limited Partners were not invited.

Mr. Donohoe: They were on the list. As far as I know, they're in Phase 1. They have 3.3 units apiece.

Mr. _____: And they chose not to come tonight to the meeting?

Mr. Elder: No. I will clarify. This is what we took the mailing from and this is COPCO's records and I discovered this this afternoon. Jack Nortman and Morando Beratini show no investors' phone numbers or anything else and I gave this to my people, one of my people in the back, to address and send out and this afternoon I started to look down at this and I discovered that those two probably did not. I can't guarantee it but I _____. Everybody else that is on this list _____

Mr. Jensen: Were there some that are not on that list?

Mr. Elder: There was no selected manner. I had my girl do it.

Mrs. Cole: It doesn't matter.

Mr. Donohoe: You've got to remember this is an informal meeting of investors in those programs for the sake of information.

Mr. Rosenblum: Perhaps as the next step we can arrange to have the _____ contacted _____ (could not hear on tape) _____

Mr. Donohoe: No. Mr. Cole has forwarned us that any such contact, at the last meeting he made this point clear and it was adhered to by those people at the last meeting I hasten to say to the letter, would jeopardize the contract. So, no one called anyone as a Limited Partner. "You're interferring with the flow of the business".

Mr. _____: Which contract?

Mr. Rosenblum: The contract with the _____?

| | |
|---|---|
| Mr. Donohoe: | No. The contract with gas people. So, we were asked not to call anybody. Just make it simple, short and sweet and have some patience and that's what I would ask everyone to do for another two or three weeks. |
| Mrs. Nathan: | And then what? |
| Mr. Donohoe: | I'd say that at that time we've gone through vacation, the majority of people are back in their norm and we're into the fall and we have another meeting to discuss the results of the tests as well as other concerns or problems that might have surfaced at that time. |
| Mr. Nathan: | What happens if the tests aren't done? |
| Mr. Donohoe: | Mr. Nathan asked what happens if the tests aren't done which is a logical question because that would put us at five months and waiting. At that time, I think it's up to the group to take control of their own destiny. |
| Mr. Dieter: | Would it be unreasonable to ask of COPCO now if we expect them to manage _____ (could not hear on tape) _____ Maybe the question should be asked of COPCO now if its unreasonable to be expecting to manage _____ (could not hear on tape) |
| Mr. Donohoe: | Mr. Dieter, to tell you the truth, I think anything is unreasonable at this point ... or reasonable. I don't know. All I can tell you is that I agreed to bring a group of people to a certain point ... a focal point ... and from there to back-off and step-out which I will probably be doing. I have no more intentions of flying to Corsicana, Texas, than I do jumping through that wall. If I never see that place again, it will be too soon. I've had it more than anybody else would even begin to believe. Alright? It's easier for me, personally, to write it off and forget it. Believe me. So, I think we'll continue with the idea and the suggestion from all that we have another meeting. |
| Mr. Cole: | Why don't we have another meeting 4 weeks from today? |
| Mr. Donohoe: | Three or four weeks from today gives everybody ample ... well, I don't know. That puts us right at the end of August and I think we're going to interfer with Labor Day. I would suggest that we have a meeting after Labor Day. |
| Mr. Jensen: | I will be in Europe all of September. I would like to have the meeting before I leave. |
| Mr. Elder: | We could hold it 4 weeks and I don't think it would interfer with the Labor Day Weekend. It would be about the 22nd or thereabouts. It would not interfer and it would not overlap and you would not be in conflict with the Labor Day Weekend and I agree I think we ought to have it. |
| Mr. Jensen: | In addition to that, I would also suggest that in as much as that could be a meeting where far reaching decisions are to be made that all limited partners are to be notified by certified mail that you are going to proceed so that a limited partner cannot come later and say that he was not informed and, as a result, the vote that was taken would be inappropriate. |
| Mr. Donohoe: | I think we'd have to do that on all cases and telephone also which we are going to do. |
| Mr. _____: | And what about the expenses here? Shouldn't we all make some contribution? |
| Mr. Donohoe: | We are asking that to form and to establish the ongoing committee, at this point, for $100 a unit. Nobody's got a gun to your head. |
| Mr. Rosenblum: | It's tax deductible. |
| Mr. Donohoe: | It's tax deductible and I hasten to add that if and when the audit is completed that, hopefully, the monies then will be reimbursed to us. And, I believe, legal counsel tells us that we have a right to be reimbursed if indeed we conduct the audit and this is what we used to |

pay the money for etc. ... etc. And, so, yes we are looking for $100 a unit, half a unit is $50 and so on and so forth made out again, for lack of a better expression, to Copco Investment Committee.

(Mass talking. Too jumbled a conversation to hear on tape)

Mr. Donohoe: We don't have 51%, but I imagine if I had to put it down to a vote, given what I've got pledged on the phone in terms of units, we could probably squeak by with 51%. Now, if you want to get legal and technical about it, what do you want to call it? How about Concerned Investors Committee? But, make it out to CIC anyway because that's what I write on top of the checks. And, it's handled by the Bank of Commerce where we have had no checks printed at no cost and no deposit slips printed at no cost and I won't bore you with all the other no cost and freebees that we've tried to twist arms on to keep this as low as possible. But, I will also point out and to reiterate Mr. Sopko's point of contention, and I agree with this more so than anybody in this room including Mr. Sopko, because it's evident to me since I've been the most immersed in this that this is cost prohibitive action. You have no idea how much time ... and if you're billin' it by the hour, and people bill their time by hour, what this cost to do. So, before we reach any rash judgement or emotional decision ____(interruption)____

Mrs. Cole: What are you talking about Terry?

Mr. Donohoe: I'm talking about if we go down the line and we find out that perhaps the General Partners should be relieved or we appoint someone to look out for our vested interests in the future, the cost of continuing one of these frontal attacks for lack of a better expression is really expensive. If you got into a legal pissing contest, forgive my French, it's very expensive and I would want to at all avoid this ... 100% avoid it. But, it might be to some people's realization or to some people's thinking that we're not going to avoid it because there's been too many problems, so _____ (interruption).

Mrs. Cole: Why can't you avoid _____(unable to hear on tape)_____

Mr. Donohoe: Because I think that some people are going to seek a better uh ...

Mr. Elder: Well, I think that rather than do that, Terry, why don't we let's leave that until right down the _____ (unable to hear on tape).

Mr. Donohoe: If they fight us which they could. Anybody could fight anybody. I'm quoting from a lady in back of the room "anybody can sue anybody."

Mrs. Cole: That's true. I mean, they wouldn't prevail.

Mr. Donohoe: I didn't say they would. I just said it's expensive.

Mrs. Cole: You do realize that we wouldn't want to disturb anything now.

Mr. Donohoe: I'm just saying that I would avoid spending any more money or time than is necessary in completing our objectives: 1) Do we have a good investment? 2) Are we going to get some money out of it? 3) Are we going to be able to control it? Alright?

Mrs. Kampka: Terry, excuse me, please. For the lack of funds that you've had for all the money you have been spending, and I don't know what you're going to come up with tonight, can we expect Interbank's cooperation in mailing the next meeting notification and if we're going to go to the expense of having a return-receipt-request, you know that kind of mailing is something like 40¢ or 50¢ probably, are we going to have their cooperation? Because it was asked before did we have their cooperation?

Mr. Donohoe: I assume that we are in agreement and that the cooperation will flow from Interbank since they have a large vested interested. But, Mr. Cole can answer that.

Mrs. Kampka: But, also in just terms of people help. I know Jack had his people addressing, you had your people working on stuff, you're giving up your own personal business expense in terms of employees working for you doing stuff, researching and sending out these letters and

that. As our brokers, I think certainly they can afford to have some of this expense borne by them. At least in mailing!

Mr. Donohoe: Again. Mr. Cole can answer that question.

Mrs. Kampka: I mean he has a vested interest in it as a limited partner himself.

Mr. Donohoe: Mr. Cole?

Mr. Cole: _____ (unable to hear on tape)

Mrs. Kampka: No. I'm not talking about the $100. I'm talking about people-power. Just to give this man _____. And we're talking about mailing at least 90 mailings $ 90 units or maybe more than that.

Mr. Elder: There are a number of multiples. It's less than that. The total number of envelopes that we addressed was something like 55 or something like that.

Mrs. Kampka: Well, I'm talking about addressing the envelopes, paying the postage, you know, something like that. If we're not going to be able to come up with the money that we need ... we're talking a few dollars here and in terms of people-power we're talking hours that these gentlemen have given in terms of their own employees' time and we're looking to you as limited partners for your own personal concerns and also as our investment company to be looking out for our concerns.

Mrs. Cole: _____
_____ (unable to hear on tape)

Mr. Cole: I don't mind doing it if _____ (unable to hear on tape) _____

Mrs. Kampka: I'm not saying for you to put it on firm name or firm stationary. I'm just asking for help with people-power, not using your stationary or your letterhead or anything else.

Mr. Cole: _____ (unable to hear on tape)

Mrs. Kampka: Yes. That's what I'm asking. We're not saying that Interbank _____ (interruption)

Mrs. Cole: All of us have problems. _____ so that any one of us could be converted into a General Partner.

Mr. Donohoe: Which is totally unadvisable for _____ (interruption)

Mrs. Cole: We'll give it some consideration, okay? Because as you know, they go beyond their limits now. _____ you did it wrong. Give it some consideration now _____ It's a fine line. It's a gray area _____ (Due to the fact that Mrs. Cole is in the far back of the room, it is extremely hard to pick her voice up on the tape)

Mr. Donohoe: I know that many of you have a long way to go back to the City, so _____ (interruption)

Mr. Elder: I would like to resolve something. And, that is, what is the purpose of this next meeting? I think we should get a concensus of the people here as to how that letter is going to read that goes out.

Mr. Rosenblum: Let me make a suggestion. I think we ought to send a letter out. I don't think expense is terrible. We can pay our mailing costs if you want, minimum, maybe more than that; but, I think it should basically get more people into the room. Invite everybody and in the process find out whether COPCO is going to come and find out if they want to be the General Partner. And, if they do want to be General Partners, find out what they expect to do for us as General Partners so we know who should be wearing the hat of the General Partner.

Mr. Jensen(?): There's no confidence left in that _____ (cannot hear on tape) _____

Mr. Rosenblum: We know we don't want their organization _____ (too much conversation to discern on tape)

Mr. Cole: I would say the purpose of the next meeting is two-fold: 1) What is reasonable and 2) to elect _____ (undiscernable on tape) _____

Mr. Donohoe: Yes, I think that's a wise idea.

Mr. Cole: _____ (undiscernable on tape from back of room)

Mr. Rosenblum: Terry, in the meantime, we mail you a check.

| | |
|---|---|
| Mr. Donohoe: | That's right to CIC, Concerned Investors Committee and I gave you the list before, but I'll give you the list again. Also, I want to point out that I want each of you to have a pass-out in the back. One is the incomplete, but attempted audit that we've got up to date, and the information that we've gathered and other items of interest. If you haven't got one, please make sure you've got one. Now, I've also got a list of correspondence that took place between myself, Mr. Elder and the CPA firm of Poulos & Bayer requesting this so you can see we did this very logically and step by step and even though we did this we didn't get the information that we were entitled to. |
| Mrs. _____: | Who's going to take care of the complete list of people, Terry? |
| Mr. Donohoe: | I'm sure with the help of Interbank we are going to have an updated list of telephone numbers and addresses. I don't think that's a big hurdle. |
| Mrs. Sopko: | I would like everybody to have that list. |
| Mr. Donohoe: | We will do the best of our ability to work on it. As a matter of fact, I would suggest to net(?) we are planning a meeting on this date and I'd suggest another letter the week before so to speak. That's my suggestion. |
| Mr. Sopko: | What would be wrong if you came up with a completed mailing list of partners in Programs # 1, # 2, # 3 & # 4 and distribute them to the Limited Partners. And, I know I'm speaking from past experience. A lot of times, you can't find people you're looking for or you can call one or the other Limited Partner and find out if your missing something. |
| Mr. Donohoe: | I'm sure, Mr. Sopko, that if I were the salesperson who sold this program that I would have contact with all of the people whether they wanted to hear from me or not. Or, visa-versa. So, I'm sure that we, between us, we can get an updated list. |
| Mrs. Sopko: | Give us a list so we can call each other up. |
| Mr. Cole: | _____ (undiscernable on tape) |
| Mr. Donohoe: | Fine, well then I'll assume also that you are going to volunteer also as an individual limited partner/investor your fair share of this "assessment", for lack of a better term, to help form this committee. |
| Mr. Cole: | (Not quite discernable on tape. Something about a second opinion.) |
| Mrs. Nathan: | What did he say? |
| Mr. Donohoe: | If you want a list of your fellow investors, I believe I have enough to cover the people that don't already have one. But, again, it may be erroneous. It may be out of date. I don't know why you'd want to call somebody else up; but, if you want to call them up, be my guest. It's a great experience! |
| | So, with that, I think we're going to conclude tonight. I thank you. |

END OF MEETING
7/24/85
Sheraton NorthShore Inn
Northbrook, IL.

* Unable to hear because of interruption.
** Unable to hear on tape because party speaking is too far from recorder.